HYDABURG COOPERATIVE ASSOCIA-
TION, OF HYDABURG, Alaska, an
Alaska Cooperative Corporation; Mary
E. Guss; Clifford H. Smith, an Alaska
Professional Corporation, Appellants,

v.

HYDABURG FISHERIES, a Partnership
and Hydaburg Fisheries, Inc., an
Alaska Corporation, Appellees.

No. S–4139.

Supreme Court of Alaska.

Feb. 21, 1992.

Dennis L. McCarty, Law Offices of Clif-
ford H. Smith, Ketchikan, for appellants.

Paul L. Dillon, Dillon & Findley, Juneau,
and Anthony L. Rafel and David N. Mark,
Culp, Guterson & Grader, Seattle, for ap-
pellees.

Before RABINOWITZ, C.J., and
BURKE, MATTHEWS, COMPTON and
MOORE, JJ.

OPINION

COMPTON, Justice.

This appeal arises out of a dispute over a joint venture agreement between Hydaburg Cooperative Association (HCA) and Hydaburg Fisheries to operate a fish processing plant in Hydaburg, Alaska. The dispute arose when the United States Department of Commerce Economic Development Administration (EDA) failed to approve the agreement. EDA's approval was necessary because HCA had received an EDA grant to develop the plant. Pursuant to the terms of the agreement, the parties submitted the dispute to arbitration. The arbitrators awarded Hydaburg Fisheries the value of the improvements it had made to the plant. HCA did not object to the award, but appeals the superior court's order directing application of the HCA's property to the judgment against it. HCA contends that it has sovereign immunity and that section 16 of the Indian Reorganization Act, 25 U.S.C. § 476, protects its assets from execution. We are unpersuaded by either of HCA's arguments and therefore affirm the superior court's order.

I. FACTUAL AND PROCEDURAL
BACKGROUND

HCA is a corporation chartered under the Indian Reorganization Act (IRA), 25 U.S.C. §§ 476-77, as made applicable to Alaska Native groups by 25 U.S.C. § 473a (1988).[1] Hydaburg Fisheries was a partnership composed of Marvin Dragseth and Milton Slater. Hydaburg Fisheries, Inc., is the successor corporation to Hydaburg Fisheries. Unless otherwise required, Hydaburg Fisheries and Hydaburg Fisheries, Inc. will be referred to as Hydaburg Fisheries.

In July 1987, HCA and Hydaburg Fisheries executed a joint venture agreement to equip and operate a fish processing plant in a building owned by HCA. The agreement recited that HCA owned a 12,600 square foot building containing blast freezers and areas for fish processing; that Hydaburg Fisheries had knowledge, contacts, equipment for processing, and operating capital; and that these resources would be pooled to form a joint venture. After payment of debt and operating expenses, any profits were to be split equally. In the event of a dispute between the parties, the agreement provided that "the matter shall be settled in accordance with the Uniform Arbitration Act of the State of Alaska."

Prior to execution of the joint venture agreement, Hydaburg Fisheries invested substantial sums of money to improve the building. According to Hydaburg Fisheries, the building lacked water, sewer, electrical and other fixtures necessary to the operation of a fish processing facility.

The building owned by HCA had been constructed using grant monies from the (EDA), the United States Department of Housing and Urban Development (HUD), and the State of Alaska. When in early 1987 the parties first began discussing doing business together, HCA advised Hydaburg Fisheries that the approval of EDA, HUD, and the State of Alaska was necessary before HCA could enter into any agreement concerning the building. Hydaburg Fisheries asserts that on or about July 23, 1987, HCA's attorney, Mary Guss, informed Hydaburg Fisheries that the necessary agency approvals had been received and that the parties could formally execute the agreement.[2]

EDA did not in fact receive a copy of the agreement until nine months after it had been signed. In October 1988, EDA ad-

---

1. The Hydaburg Cooperative Association was initially organized in 1938 under a constitution and bylaws enacted pursuant to section 16 of the IRA. 25 U.S.C. § 476. At the time of its organization, the association was granted also a corporate charter pursuant to section 17 of the IRA 25 U.S.C. § 477.

2. According to HCA, Diane Church, EDA project manager, approved the joint venture agreement during a telephone conversation with Mary Guss on June 11, 1987.

vised HCA that the joint venture agreement violated the grant from EDA to HCA.

Hydaburg Fisheries requested assurance from HCA in November 1988 that HCA would repay the grant as EDA had requested or, in the alternative, that it provide Hydaburg Fisheries with written assurances from EDA that the agency would not exercise its regulatory authority to foreclose the property during the unexpired term of the joint venture agreement. Hydaburg Fisheries also requested HCA to agree to suspend operations at the plant pending receipt of such assurance, to pay its share of the joint venture's financial losses for 1987 and to provide assurance that it would have adequate financial resources to share in any future losses.[3] Hydaburg Fisheries did not receive any of the requested assurances and consequently terminated the joint venture agreement.

Hydaburg Fisheries sued HCA for violation of the Alaska Partnership Act, breach of contract, unjust enrichment and negligent misrepresentation. In response, HCA moved the court to order arbitration of the dispute pursuant to paragraph 14 of the joint venture agreement.[4] The court granted HCA's motion and appointed three arbitrators.

The arbitrators held a hearing in Ketchikan on October 23–27, 1989, at which witnesses testified and exhibits were admitted in evidence. The arbitrators found HCA liable for breach of contract and unjust enrichment, and awarded Hydaburg Fisheries damages of $201,270 to compensate it for "the value to [HCA] of the capital improvements to the cold storage facility." In addition, the arbitrators awarded Hydaburg Fisheries the costs of removal and transportation of its equipment from Hydaburg.[5] The arbitrators denied Hydaburg Fisheries' claims for violation of the partnership act and for negligent misrepresentation, and denied HCA's counterclaim. The superior court confirmed the arbitration award and entered a judgment against HCA.

On May 14, 1990, HCA filed an "Application for Declaratory Judgment" that raised for the first time a sovereign immunity defense based on section 16 of the IRA. 25 U.S.C. § 476 (1988).[6] At the same time, without offering to post security of any kind, HCA moved to stay enforcement of the judgment against it. The superior court denied the motion and HCA did not appeal the order.

HCA then moved for a protective order so that it could avoid Hydaburg Fisheries' efforts to identify the association's assets subject to execution. On June 23, 1990, the superior court denied HCA's motion and granted Hydaburg Fisheries' motion for a debtor examination. Following a hearing, the court entered an order on July 20, 1990, directing application of property to satisfaction of the judgment. It is this order that HCA now appeals.[7]

## II.  DISCUSSION

### A.  HCA is not Entitled to Sovereign Immunity.

We have held that Alaska Native associations generally do not have sovereign immunity. *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 34 (Alaska 1988).  In *Native Vil-*

---

3.  Hydaburg Fisheries had advanced all the operating expenses.  The processing plant lost approximately $320,000 in 1987.

4.  Apparently, HCA also filed an answer and a counterclaim to Hydaburg Fisheries' complaint, but these documents were not included in the record on appeal.

5.  Removal costs were fixed at $17,163.28 and a final decision was rendered in favor of Hydaburg Fisheries for $218,433.28.

6.  HCA also filed a "Complaint for Declaratory Judgment" as a new action under Case No. 1KE–90–555 CI.  The complaint was never served and was ordered dismissed by the superior court as a sanction for HCA's willful failure to provide discovery regarding its assets.

7.  On August 30, 1990, Hydaburg Fisheries moved for sanctions against HCA for its refusal to produce documents as required by the superior court's June 23 and July 20, 1990 orders. The court granted this motion. Although HCA did not appeal the sanctions, according to Hydaburg Fisheries the association has neither produced the documents nor paid the sanctions and fees.

*lage of Stevens,* we stated that judicial recognition of a native group as a sovereign is dependent on "whether Congress, or the executive branch of the federal government, ha[s] recognized the particular group in question as a tribe." 757 P.2d at 34–35.

■ HCA offered no evidence to the trial court and fails to make any argument on appeal that the federal government has recognized the association as a tribe. Village reorganization under section 16 by itself is not sufficient to establish tribal status for purposes concerning the doctrine of tribal sovereign immunity. *Native Village of Stevens,* 757 P.2d at 40. Even the dissent in *Native Village of Stevens* agrees with this principle. 757 P.2d at 45 n. 6 (Rabinowitz, C.J., dissenting). *See also State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1387 (9th Cir.1988).

■ Assuming arguendo that HCA would be entitled to sovereign immunity based on its historical tribal status, HCA waived its immunity by agreeing to arbitrate its dispute with Hydaburg Fisheries. In *Native Village of Eyak v. GC Contractors,* 658 P.2d 756, 760 (Alaska 1983), we held that a contractual agreement to arbitrate waives any immunity from suit. Eyak had entered into a contract with GC Contractors under which GC Contractors was to build a community center for Eyak on land leased by Eyak. Pursuant to an arbitration clause in the contract, the parties submitted to arbitration a dispute concerning Eyak's failure to pay $13,745.98 due under the contract. The arbitrator rejected Eyak's argument that it would not be bound by any arbitration decision on the grounds of sovereign immunity and awarded GC Contractors the full sum sought. We affirmed the superior court's confirmation of the arbitration award. *Id.*

The United States Court of Appeals for the Ninth Circuit recently reached the opposite result, holding that consent to arbitrate disputes arising out of a management agreement between an Indian tribe and the non-Indian operator of the tribe's bingo enterprise did not constitute a waiver of the tribe's sovereign immunity. *Pan American Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 418–20 (9th Cir. 1989) (affirming dismissal of Pan American's suit challenging the validity of an amended bingo ordinance requiring additional fees to operate the bingo business). The Court held that waiver may only be found if the clause "unequivocally and expressly indicates the [tribe's] consent to waive its sovereign immunity." *Id.* at 418 (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)).

Unlike *Native Village of Eyak, Pan American* did not involve a suit to compel arbitration or enforce an arbitration award. Instead, by challenging the validity of a tribal ordinance, Pan American directly attacked the tribe's authority to regulate affairs on its reservation. Arguably, even under *Pan American* an agreement to arbitrate disputes arising out of a contract constitutes a tribe's consent to suit for the limited purposes of compelling arbitration or enforcing an arbitration award.

This principle is well established in situations involving foreign sovereigns. The Restatement of the Foreign Relations Law of the United States provides:

[A]n agreement to arbitrate is a waiver of immunity from jurisdiction in

(i) an action or other proceeding to compel arbitration pursuant to the agreement; and

(ii) an action to enforce an arbitral award rendered pursuant to the agreement; . . .

1 *Restatement (Third) of the Foreign Relations Law of the United States* § 456(2)(b) (1987); *see also* Foreign Sovereigns Immunities Act, 28 U.S.C. § 1605(a)(6) (1988); *M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad and Tobago,* 725 F.Supp. 52 (D.D.C.1989) (denying motion to dismiss, for lack of jurisdiction, petition to confirm arbitration award between Canadian contractor and Republic

of Trinidad and Tobago); *Liberian Eastern Timber Corp. v. Government of Republic of Liberia,* 650 F.Supp. 73 (S.D.N.Y. 1986), *aff'd,* 854 F.2d 1314 (2d Cir.1987); *Sperry Int'l Trade, Inc. v. Government of Israel,* 532 F.Supp. 901, 908–09 (S.D.N.Y. 1982) (granting Sperry's motion to confirm arbitration award, relying in part on section in contract providing that Government of Israel "waives any and all rights to claim sovereign immunity in any court of competent jurisdiction within the U.S. with respect to any suit in equity, action in law, or arbitration proceeding ... [and] further waives any right to sovereign immunity with respect to any attachment, levy or execution resulting from a decree or judgment of any of the aforementioned courts on its commercial or quasi-governmental property or any funds ... deposited in or handled by any banking institution or other entity within the United States." (emphasis omitted)); *Ipitrade Int'l v. Federal Republic of Nigeria,* 465 F.Supp. 824, 826 (D.D.C. 1978) (holding that *Nigeria*'s agreement to adjudicate all disputes arising under a contract in accordance with Swiss law and by arbitration under International Chamber of Commerce rules constituted waiver of sovereign immunity under Foreign Sovereign Immunities Act). *Cf. Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094 (D.C.Cir.1982) (holding that agreement in commercial contract between Republic of Guinea and Liechtenstein corporation to submit future disputes to arbitration conducted by International Center for Settlement of Investment Disputes could not be deemed an implicit waiver of Guinea's sovereign immunity before district court, even though Center arbitrations normally take place in Washington, D.C., since the agreement did not foresee a role for United States courts), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983) (because commercial activities of NNPC have no direct effect in the United States, "[i]t is more probable than not that NNPC did not contemplate that disputes concerning the contract at issue would be resolved in a United States court.").

Federal courts have explicitly held that Indian tribes are not foreign states. *Native Village of Noatak v. Hoffman,* 896 F.2d 1157, 1163 (9th Cir.1990) (citing *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831)). Nevertheless, the rationale of the cases relating to waiver of immunity by foreign sovereigns is equally applicable to waiver of sovereign immunity by Indian tribes. An arbitration clause in an agreement executed by an Indian tribe would be meaningless if it did not constitute a waiver of the tribe's immunity from suit to compel arbitration or to enforce an arbitration award. *Native Village of Eyak,* 658 P.2d at 760.

■ The facts of this case establish that the superior court had jurisdiction to enforce the arbitration award against HCA. The parties in *Pan American* agreed to "subject themselves to the jurisdiction of the American Arbitration Association." 884 F.2d at 419. They did not subject themselves to the jurisdiction of either federal or state courts. The arbitration clause between HCA and Hydaburg Fisheries, on the other hand, states: "In the event of a dispute between the parties hereto, the matter shall be settled in accordance with the Uniform Arbitration Act of the State of Alaska." The Alaska Uniform Arbitration Act gave the state superior court jurisdiction to order arbitration and to enter judgment on its arbitration awards. AS 09.43.-170.

In addition, HCA itself requested the superior court to order arbitration. HCA did not oppose confirmation of the arbitration award, except as to the issue of the arbitrators' fees. Finally, HCA did not appeal the final judgment in the amount of the arbitration award entered against the association by the superior court. The court entered final judgment on May 9, 1990. Under Rule of Appellate Procedure 204, HCA had 30 days to appeal from the date shown on the certificate of distribution. HCA's notice of appeal, not filed until August 15, seeks review only of the July 20, 1990 Order Directing Application of Property to Judgment.

### B. HCA Failed to Prove that its Property is Exempt from Execution.

While HCA cannot at this point challenge the judgment against it, the association can protect certain of its assets from execution under section 16 of the IRA.[8] Section 16 provides in part:

In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: ... to prevent the sale, disposition, lease, or encumbrance of tribal lands, interest in lands, or other tribal assets without consent of the tribe.

25 U.S.C. § 476 (1988). In *Matter of City of Nome*, 780 P.2d 363, 367 (Alaska 1989), we held that section 16 bars the city from foreclosing on lands owned by the Nome Eskimo Community (NEC) without NEC's consent.

■ The relevant issue is whether HCA's assets subject to the superior court's July 20, 1990 order are assets of a section 16 or a section 17 organization. The IRA permitted Native groups to form dual entities—section 16 governments and section 17 corporations.[9] Section 17 corporations are amenable to suit and their assets are subject to execution. Section 16 entities can hold property and protect it from disposition or encumbrance without consent. *See Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp.

**8.** Again, the Restatement is instructive:
Under international law:

· · · · ·

a waiver of immunity from suit does not imply a waiver of immunity from attachment of property....
*Restatement (Third) of the Foreign Relations Law of the United States* § 456(1)(b) (1987); *see also Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir.1984) (rejected district court's rationale that if jurisdictional immunity is lifted, the presumption is that there will be a right to execute).

If HCA were a foreign sovereign, the court's order directing application of its property to judgment would be valid under the Foreign Sovereign Immunities Act (Act). The Act provides in part:

The property in the United States of a foreign state ... shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State ... if

· · · · ·

(2) the property is or was used for the commercial activity upon which the claim is based, or

· · · · ·

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement.
28 U.S.C. § 1610 (1988); *see also Restatement (Third) of the Foreign Relations Law of the United States* § 460(2)(b) (1987).

**9.** Section 16 of the IRA provides in part:
Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe.
25 U.S.C. § 476 (1988).
Section 17 provides:
The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided,* That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.
25 U.S.C. § 477 (1988). Both sections have been slightly amended since 1988. 25 U.S.C.A. §§ 476–77 (West Supp.1991). None of the changes are relevant to this case.
We have recognized that section 16 governmental units and section 17 corporations are separate legal entities. *Atkinson v. Haldane*, 569 P.2d 151, 174 (Alaska 1977) ("sue and be sued clause in corporate charter did not waive tribal government's immunity from suit in wrongful death action by two Metlakatla Indians on the Metlakatla reservation.").

1127, 1131 (D.Alaska 1978); *City of Nome,* 780 P.2d at 365–67; *Atkinson,* 569 P.2d at 174–75.

Whether assets are exempt section 16 assets or non-exempt section 17 assets is a matter of proof. In upholding NEC's section 16 exemption in *Matter of Nome,* we relied on the factual determination by the Board of Equalization of the City of Nome, not challenged on appeal, that the property was held by the section 16 entity, not the non-profit corporation. 780 P.2d at 365 n. 2. In *Parker Drilling,* the court denied cross motions for summary judgment, finding disputed issues of fact as to whether the tribe's airport was operated in a section 16 or section 17 capacity. 451 F.Supp. at 1132–35. *See also* Opinion of the Solicitor, Department of Interior, No. M–36545 (Dec. 16, 1958) (quoted in *Atkinson,* 569 P.2d at 171–72) (emphasizing need for documentary evidence to establish corporate nature of assets).

■ The burden of proving a section 16 exemption from execution was upon HCA.

A debtor claiming an exemption generally must prove that his claim comes within the exemption provisions. Where an issue is left in doubt by the proof so that a court would be required to speculate, the party on which the burden of proof ultimately rests must lose.

31 Am.Jur.2d *Exemption* § 367 (1989); *accord Hancock v. Stockmen's Bank & Trust Co.,* 739 P.2d 760, 761–63 (Wyo.1987) (holding that exemptions are affirmative defenses which debtor must assert and prove). This is consistent with the general rule that a Native entity asserting sover-

eign immunity bears the burden of proving it is a tribe. *See The Board of Equalization for the Borough of Ketchikan v. Alaska Native Brotherhood and Sisterhood, No. 14,* 666 P.2d 1015, 1023 (Alaska 1983) (Rabinowitz, J., concurring). It is also consistent with the general policy of placing the burden on the party that controls the proof. *See Sloan v. Jefferson,* 758 P.2d 81, 83 (Alaska 1988).[10]

■ HCA did not meet its burden of proving exemption at the July 20, 1990 hearing. Arguably, who bears the burden of proof is not determinative in this case. HCA's failure was not that it presented unconvincing evidence; HCA presented *no* evidence in response to that offered by Hydaburg Fisheries concerning the ownership of the assets at issue. In fact, HCA tried to avoid the July 20 debtor examination hearing and refused to provide discovery.

Sufficient evidence exists in the record to support the superior court's order of execution. The order applies only to those HCA assets involved in the joint venture with Hydaburg Fisheries.[11] Operation of a fish processing facility was a section 17 corporate function under paragraph 1 of the charter. The funds used to construct the facility came to the corporation pursuant to paragraphs 5(b) and (d) of the charter. The corporation had authority to own and operate the facility pursuant to paragraphs 5(b) and (e). The corporation had authority to enter into the joint venture agreement pursuant to paragraph 5(f). At the July 20 hearing, HCA's president acknowledged that HCA's entry into the joint venture agreement was a "business decision" con-

---

10. This position does not require us to reject the presumption that the assets of a Native group belong to the governmental unit rather than to the section 17 corporation. *See Atkinson,* 569 P.2d at 172 ("Unless documentary evidence such as a conveyance to the business corporation or contractual agreement, by resolution or otherwise, gives the business corporation an agency or proprietary relationship to certain property, it can be assumed that the corporation is not directly involved.") (quoting Opinion of the Solicitor, Department of Interior, No. M–36545 (Dec. 16, 1958)). Nor is the position inconsistent with the general tenet of Indian law that all

ambiguities must be resolved in favor of the Indians. *See Santa Rosa Band of Indians v. King County,* 532 F.2d 655, 660 (9th Cir.1975); *Parker Drilling,* 451 F.Supp. at 1140; *City of Nome,* 780 P.2d at 367. The normal presumption in favor of a Native group is inapplicable when such group is claiming an exemption from debt.

11. Execution against the fish processing building itself is particularly appropriate since much of the building's value is attributable to capital improvements made by Hydaburg Fisheries.

curred by all members of the board.[12]

AFFIRMED.

RABINOWITZ, C.J., concurs in part, dissents in part.

RABINOWITZ, Chief Justice, concurring in part, dissenting in part.

The court correctly concludes that Hyda-burg waived its claim to sovereign immunity. Although I concur in this result, I write separately because I disagree with the court's analysis in reaching this conclusion.

It is settled law that when a tribe brings an action in court, the tribe necessarily consents to the court's jurisdiction to determine the claims brought against the tribe.[1] *See, e.g., Washington v. Confederated Bands of Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). Accordingly, since HCA requested the superior court to order arbitration, HCA necessarily consented to the court's jurisdiction and waived any claims to sovereign immunity. This consent disposes of the issue of sovereign immunity, making discussion of contractual arbitration provisions, and principles of international law, superfluous.

The United States Supreme Court recently reaffirmed the longstanding doctrine of tribal sovereign immunity. *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe,* — U.S. —, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). Writing for a unanimous court, Chief Justice Rehnquist stated:

A doctrine of Indian tribal immunity was originally enunciated by this Court, and has been reaffirmed in a number of cases. *Turner v. United States,* 248

U.S. 354, 358 [39 S.Ct. 109, 110, 63 L.Ed. 291] (1919); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49 [98 S.Ct. 1670, 56 L.Ed.2d 106] (1978). Congress has always been at liberty to dispense with such tribal immunity or to limit it. Although Congress has occasionally authorized limited classes of suits against Indian tribes, it has never authorized suits to enforce tax assessments. Instead, Congress has consistently reiterated its approval of the immunity doctrine. *See, e.g.,* Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. 1451 et seq., and the Indian Self–Determination and Education Assistance Act, 88 Stat. 2203, 25 U.S.C. 450 et seq. These Acts reflect Congress' desire to promote the "goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216 [107 S.Ct. 1083, 1092, 94 L.Ed.2d 244] (1987). Under these circumstances, we are not disposed to modify the long-established principle of tribal sovereign immunity.

*Oklahoma Tax Comm'n,* — U.S. at —, 111 S.Ct. at 910, 112 L.Ed.2d at 1120.

One of the fundamental principles of tribal sovereign immunity is that a tribe's immunity remains intact unless surrendered in express and unequivocal terms. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Moreover, a waiver of sovereign immunity cannot be implied, but must be unequivocally expressed. *Id.* Accordingly, the Ninth Circuit Court of Appeals has rejected the notion that contractual arbitration provisions suffice to waive tribal immunity. *Pan American Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416

---

**12.** HCA argues that we should remand the case to the superior court for a determination of whether HCA was a section 16 or section 17 entity. Such action is inappropriate in light of HCA's failure to request the trial court to make such a finding. As a general rule, we will not consider an issue raised for the first time on appeal. *State v. Northwestern Const., Inc.,* 741 P.2d 235, 239 (Alaska 1987). The exceptions to this rule are inapplicable. HCA's argument depends on new and controverted facts and as

discussed above the superior court's ruling does not constitute "plain error."

**1.** This consent does not apply to crossclaims. *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). Neither does a tribe waive its sovereign immunity by filing an action for declaratory relief. *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* — U.S. —, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991).

(9th Cir.1989); *see also American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe,* 780 F.2d 1374, 1377–78 (8th Cir.1985); *Wichita and Affiliated Tribes v. Hodel,* 788 F.2d 765, 773 (D.C.Cir. 1986). In *Pan American* the court noted that, based on its earlier holding in *United States v. Oregon,* 657 F.2d 1009 (9th Cir. 1981), two subsequent state court cases have interpreted contractual arbitration provisions as waiving tribal immunity. 884 F.2d at 419 (citing *Native Village of Eyak v. GC Contractors,* 658 P.2d 756 (Alaska 1983); *Val/Del, Inc. v. Superior Court,* 145 Ariz. 558, 703 P.2d 502, *cert. denied,* 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 257 (1985)). Correcting the misconception that *Oregon* supported such a result, the court stated: "Our decision in *United States v. Oregon,* 657 F.2d 1009 (9th Cir.1981), in no way lessens the fundamental principle that tribal sovereign immunity remains intact unless surrendered in express and unequivocal terms." *Pan American,* 884 F.2d at 419. The Ninth Circuit emphasized that its earlier holding in *Oregon* was not premised on the arbitration clause, but on the tribe's consent to suit in prior, related litigation. *Id.* at 420. Moreover, the court stated:

> Whether or to what extent this arbitration clause constituted a waiver of the Band's tribal sovereign immunity turns on the terms of that clause. *Santa Clara Pueblo* commands that waiver may only be found if the clause unequivocally and expressly indicates the Band's consent to waive its sovereign immunity.

*Id.* at 418 (citations omitted). The *Pan American* court conceded that *Oregon*'s finding of waiver probably tests the outer limits of *Santa Clara Pueblo*'s admonition against implied waivers," and noted that "several post-*Oregon* Ninth Circuit cases have reaffirmed the principle that tribal consent to suit must be unequivocally expressed." *Id.* at 420.

Further, the court's reliance on principles of foreign sovereign immunity under principles of international law are, in my view, misplaced. The sovereign powers of Indian nations have long been distinguished from those powers of other sovereign nations. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). Indian tribes are domestic dependent nations, which exercise all powers of inherent sovereignty not otherwise extinguished by acts of Congress. *Id.* Chief Justice Marshall observed in *Cherokee Nation* that "[t]he condition of the Indians in relation to the United States is perhaps unlike that of any other two people in existence.... [T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else." *Id.* at 16. Because of the special relationship requiring the United States to adhere strictly to the trust relationship in its dealings with Indians, there is a strong presumption against waiver by Indian tribes. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Therefore, the international law doctrine of foreign sovereign immunity favoring waiver is inapplicable in the context of tribal sovereign immunity.

I dissent from the majority's holding that HCA's assets may be executed upon because HCA failed to meet its burden of proving that its assets are protected under § 16 of the IRA. The record shows that at the July 20, 1990 hearing, the superior court never reached the issue of whether the assets were the assets of a § 16 or § 17 entity. Such a determination is necessary before execution can be had on the judgment because control over tribal assets is retained in the tribe's governing body pursuant to § 16, except where that body specifically transfers assets to a § 17 corporation.[2]

That HCA was involved in a commercial agreement does not overcome the presumption that its assets are exempt from execution unless specifically conveyed or set aside to the § 17 corporation. *See S. Unique, Ltd. v. Gila River Pima–Marico-*

---

2. 25 U.S.C. § 476 expressly gives tribes organized under it the right to "prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." *See also* F. Cohen, *Federal Indian Law* 326 n. 381 (1982 ed.).

*pa Indian Community,* 674 P.2d 1376, 1382 (Ariz.App.1983) ("The distinction to be made is not between commercial and governmental functions in order to determine the availability of the defense of sovereign immunity."); *see also Maryland Casualty Co. v. Citizens Nat'l. Bank,* 361 F.2d 517, 521 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966) ("The fact that the [ ] Tribe was engaged in an enterprise private or commercial in character, rather than governmental, is not material."). Thus, I believe that in order for execution to be had against the assets of HCA, it must first be shown that such assets were conveyed or assigned to the § 17 corporation.