CITY OF HYDABURG, Appellant,

v.

HYDABURG COOPERATIVE ASSOCIA-
TION, Mary E. Guss, Clifford H. Smith,
Hydaburg Fisheries and Hydaburg
Fisheries, Inc., Appellees.

ECONOMIC DEVELOPMENT
ADMINISTRATION,
Appellant,

v.

HYDABURG COOPERATIVE ASSOCIA-
TION, Mary E. Guss, Clifford H. Smith,
Hydaburg Fisheries and Hydaburg
Fisheries, Inc., Appellees.

Nos. S–4613, S–4615.

Supreme Court of Alaska.

Aug. 27, 1993.

Patrick E. Murphy, Batchelor, Murphy & Brinkman, Juneau, for appellant, City of Hydaburg in No. S–4613, for appellees in No. S–4615.

Susan Lindquist, Asst. U.S. Atty., Wevley Wm. Shea, U.S. Atty., Anchorage, and Stuart M. Gerson, Asst. Atty. Gen., Robert S. Greenspan, and Michael E. Robinson, Attys., Appellate Staff, Civ. Div., Dept. of Justice, for appellant Economic Development Admin., in No. S–4615.

Paul L. Dillon, Dillon and Findley, Juneau, and Anthony L. Rafel, Culp, Guterson & Grader, Seattle, for appellees in No. S–4613 and S–4615.

Before MOORE, C.J., and RABINOWITZ, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Justice.

Hydaburg Fisheries and Hydaburg Fisheries, Inc. ("Hydaburg Fisheries") obtained a judgment against Hydaburg Cooperative Association [1] ("HCA") and proceeded to execute against HCA's property. The Economic Development Administration ("EDA") and the City of Hydaburg ("City") claimed interests in HCA's property and sought to block the execution or to establish the superiority of their claims as against Hydaburg Fisheries. The superior court rejected their claims. This appeal followed.

In 1974 the City received from the State of Alaska title to tidelands identified in Alaska Tidelands Patent No. 270 and Alaska Tidelands Survey No. 270. Additionally, the City received title by quitclaim deed to a small portion of Lot 1, Block 14 from HCA. In 1983 the City leased these properties to the Hydaburg Indian Reorganization Act Council ("Hydaburg IRA Council") pursuant to a plan

> whereby the City could obtain federal Economic Development Administration funds to rockfill the Site and the Hydaburg Indian Reorganization Act Council (hereinafter IRA) has tentative approval, dependent upon this lease, to secure a block grant from the federal department of Housing and Urban Development to construct a fish processing facility....

One of the conditions of the lease stated:

> Permanent building and utilities on expiration, termination or cancellation of this lease shall become the property of the City. Provided, if this lease be declared void by a court of law, all improvements of whatever nature on Site shall become the property of the City that the City may best give effect to the purposes for which this lease is granted.[2]

In 1987, as part of an "Overall Economic Development Plan" the City applied for a Community Development Block Grant from the State of Alaska for the purpose of funding a "project" which was to

> provide the City of Hydaburg with funds to complete the new processing plant and cold storage facility. When completed the facility will operate year round and provide a significant boost to the economy.
>
> ....
>
> The new fish processing plant is located on an industrial landfill, constructed on city owned tidelands, under an agree-

---

1. HCA was chartered under the Indian Reorganization Act of 1934, as amended in 1936, to further the economic development of Indians engaged in the fishing industry in Hydaburg, Alaska.

2. The Hydaburg IRA Council subsequently assigned its rights under the 1983 lease and agreement with the City to HCA.

ment with the Hydaburg IRA Tribal Council, owner of adjacent property.

In accordance with this community development project, the City signed a Property Management Agreement with EDA and HCA which stipulated, among other things:

3. The real property acquired as part of the Project or specifically improved and included as a part of the Project ... and including any interest therein, shall not be sold, leased, transferred, conveyed or mortgaged without prior written consent of the Assistant Secretary.

HCA constructed a fish processing plant with a $500,000 grant from the U.S. Department of Housing and Urban Development ("HUD") and purchased and installed a cold storage facility for use in the fish processing plant with a $600,000 grant from EDA. The EDA grant agreement to HCA expressly provided that it was "subject to" the "Standard Terms and Conditions" required for Public Works and Development facilities, including the Public Works Act regulations set forth at 13 C.F.R. Chapter III and the property management standards set forth in Office of Management and Budget ("OMB") Circular No. A–102.

Under the provisions of Circular No. A–102, the grantee may dispose of an item of nonexpendable personal property ("tangible personal property" purchased with grant funds) costing more than $1,000 only after compensating EDA to the extent of its participation in the original project. HCA and EDA also entered into a Property Management Agreement with the City which stated in part:

[T]o assure that the benefits of the Project will accrue to the public and be used as intended by both EDA and the Grant-

ee [HCA], the Grantee and Owner [City of Hydaburg] hereby covenant and agree as follows:

. . . .

2. During its expected useful life the Project shall not be used for other than the purposes for which the Project was financed by EDA, as stated in the application, unless prior written approval of the Assistant Secretary is obtained.

3. The real property acquired as part of the Project or specifically improved and included as a part of the Project ... shall not be sold, leased, transferred, conveyed or mortgaged without prior written consent of the Assistant Secretary.

4. Whenever real property is sold, leased or otherwise conveyed pursuant to 13 CFR 314.3(a)(1), the transferor shall add to the document conveying such interest a covenant, which has been previously approved by the Assistant Secretary, prohibiting the use of such property for any purpose other than the general and special purpose of the Grant as determined by the Assistant Secretary. The instrument containing this covenant shall be recorded in the pertinent county public records affecting real property or filed with the appropriate office in the Bureau of Indian Affairs in the case of Indian Projects.

The Property Management Agreement was recorded in the Ketchikan Recording Office.

The events which precipitated the subject foreclosure proceedings by Hydaburg Fisheries against HCA are detailed in a letter dated October 17, 1988 from John Woodward, EDA Regional Director, to Sylvester Peele, President of HCA:[3]

---

**3.** The EDA Regional Director noted that during construction of the project "HCA became aware that, because of State funding shortfalls and delays, it would be unable to purchase the necessary processing equipment to operate the facility." HCA, therefore, requested permission from EDA to lease the facility and the request was denied. EDA denied the request to lease because it would constitute a change in the project scope and would violate Federal property management standards. HCA was unable to locate other sources of funding and eventually

requested that the grant be terminated and arrangements be made for all EDA grant funds to be repaid so that the facility could be leased. In addition, HCA informed EDA that "because of economic hardship in the community, it would be impossible to repay EDA in one lump sum." HCA inquired if a payment schedule could be arranged utilizing the profits from the EDA fish-processing facility. EDA advised HCA that an alternative repayment schedule was unfeasible and recommended that HCA seek other solutions such as retaining full ownership and con-

On July 23, 1987, the Hydaburg Cooperative Association executed a "Joint Management Agreement" with Hydaburg Fisheries, which provided the processing equipment, among other things. HCA submitted a copy of the executed agreement to EDA for approval, along with its letter of February 19, 1988. Those documents never reached EDA. Copies of the letter and Agreement were finally received by EDA on April 19, 1988. EDA requested clarification and additional documentation concerning the Agreement in its letters of June 1, July 8 and September 28, 1988.

Upon receiving documentation clarifying the joint-agreement between Hydaburg Fisheries and HCA, EDA terminated its grant to HCA on the ground that the "Joint Management Agreement" between HCA and Hydaburg Fisheries was in violation of the EDA grant because it was "more than a mere management agreement and [constituted] a transfer of such incidents of ownership as possession, use and control of the facility." EDA demanded "full repayment, with interest, in a reasonable time (i.e., within six months)."

Hydaburg Fisheries requested that HCA give assurances that it would repay the grant pursuant to EDA's letter. In the alternative, Hydaburg Fisheries wanted HCA to provide a written assurance from EDA that EDA would not initiate foreclosure proceedings during the remainder of the joint venture agreement's term. HCA did not comply with Hydaburg Fisheries' request. Hydaburg Fisheries subsequently terminated its joint venture agreement with HCA and sued to recover its investment.

**Procedural History**

Hydaburg Fisheries' claim against HCA was referred to a panel of arbitrators pursuant to an arbitration provision in their joint venture agreement. The arbitrators found in favor of Hydaburg Fisheries. Thereafter, the superior court confirmed the arbitration award and entered judgment in favor of Hydaburg Fisheries.[4]

Hydaburg Fisheries then filed a creditor's affidavit against HCA claiming a total judgment of $228,420.74 and requesting issuance of a writ of execution. The affidavit listed the following property as non-exempt properties of HCA:

1. The specialty seafood plant building located on Lot 1, Block 14, U.S. Survey No. 1570, Hydaburg townsite, Ketchikan Recording District and adjacent tidelands identified in Alaska Tidelands Patent No. 270 and Alaska Tidelands Survey No. 270.

2. All of the contents of the specialty seafood plant building described in paragraph 1 above, including but not limited to the cold storage facility and related cold storage equipment within said building.

3. Lot 1, Block 14, U.S. Survey No. 1570, Hydaburg Townsite, Ketchikan Recording District, except that portion conveyed to the City of Hydaburg under a quitclaim deed filed with the Ketchikan Recording District on May 11, 1980 and recorded in Book 138, pages 100–101, a copy of which is attached hereto as Exhibit A.

4. All other property of Hydaburg Cooperative Association subject to execution.

The City and EDA then filed Notices of Third–Party Claim pursuant to AS 09.35.130. The superior court denied the City's claim of interest, ruling in part that the City's interest "is at most that of an unliquidated, unsecured creditor. The city also lacks standing to raise many of its claims: it does not stand on [sic] the shoes of other government grantors who may claim a superior interest in the property."

---

trol of the facility while contracting management out to a private party.

4. HCA subsequently filed an application for a declaratory judgment and moved to stay the enforcement of the judgment asserting that it had immunity and that section 16 of the Indian Reorganization Act protected its assets from execution. The motion was denied on April 26, 1991 and this court affirmed on appeal. *Hydaburg Cooperative Ass'n, of Hydaburg v. Hydaburg Fisheries,* 826 P.2d 751 (Alaska 1992).

In explaining its denial of EDA's third party claim of interest, the superior court stated:

> The following personal property is at issue in this proceeding: insulated panels that form the walls and ceilings of chilling, cold storage, and freezing rooms within a larger processing plant building owned by HCA; compressor units that cool the just-described rooms; an ice-making machine; control panels; and an extractor unit on a concrete pad outside but immediately adjacent to the plant building owned by HCA. Based upon the evidence presented at the evidentiary hearing, the court is satisfied that the property just described constitutes movable equipment or machinery that is personal property, not real property.
>
> For the reasons set out in Hydaburg Fisheries' brief in opposition filed February 25, 1991, the third-party claim of EDA will be denied and Hydaburg Fisheries will be permitted to proceed with the execution sale.

Pursuant to the judgment of execution, the Department of Public Safety conducted three successive public sales on July 2, July 9, and July 16, 1991. At the third sale, the property was sold to Hydaburg Fisheries. On October 11, 1991, the superior court entered an order confirming the sale.

**Standards of Review**

■ We review the trial court's factual findings regarding EDA's and the City's claimed interests under a "clearly erroneous" standard. A finding is clearly erroneous if it leaves this court with "a definite and firm conviction on the entire record that a mistake has been made." *Parker v. Northern Mixing Co.*, 756 P.2d 881, 891 n. 23 (Alaska 1988).

■ In matters of statutory interpretation this court exercises its independent judgment. *Waller v. Richardson*, 757 P.2d 1036, 1039 n. 4 (Alaska 1988).

**Arguments**

**I. DID THE SUPERIOR COURT ERR IN ITS RULING THAT THE CITY OF HYDABURG LACKED STANDING TO RAISE MANY OF ITS CLAIMS?**

The City argues that the superior court erred as a matter of law in holding that it lacked standing to raise many of its claims. The City relies on *Trustees For Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988), which holds that the basic requirement for standing in Alaska is adversity, and AS 09.35.130[5] in support of its argument. Appellees do not address the standing argument.

The superior court denied the City standing on the basis that "it does not stand on [sic] the shoes of other government grantors who may claim a superior interest in the property." *See State Dep't of Transp. and Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 630 (Alaska 1989) (noting that under limited circumstances, a litigant may assert the rights of another). We need not reach the issue of third-party standing, however, because we find that the City claims the property in its own right.

■ The City has legal title to lands underlying the seafood processing plant and claims title to the processing building itself upon expiration of its lease with HCA. Since these are the types of interests which are protected under AS 09.35.-130, the superior court erred in concluding

---

**5.** Alaska Statute 09.35.130 reads:

**Third party claims.** If property levied upon is claimed by a third person as the person's property by an affidavit of title to the property, or right to the possession of the property and the ground of the title or right, stating the value of the property, and delivered to the person making the levy, that person shall release the property. However, the plaintiff, on demand of the person, may give the person an undertaking executed by two sufficient sureties in a sum equal to double the value of the property levied upon. The undertaking shall be in favor of and shall indemnify the third person against loss, liability, damages, and costs, by reason of the taking or sale of the property by the person.

that the City lacked standing to raise its claims.

## II. DID THE SUPERIOR COURT ERR IN HOLDING THAT THE CITY OF HYDABURG LACKED ANY EQUITABLE, LEGAL OR POSSESSORY INTEREST IN THE PROPERTY SOUGHT TO BE EXECUTED UPON BY A JUDGMENT CREDITOR PURSUANT TO AS 09.35.130?

Appellees argue that the City failed to submit proof of an interest superior to Hydaburg Fisheries' judgment lien. More particularly, Appellees assert that the City failed to make the argument that its ownership of the land under the HCA building could prevent execution on the building, and claim that this argument is raised for the first time on appeal.[6] Appellees contend that they executed solely against HCA's land, building and equipment and the City offered the superior court no documentary or testimonial evidence of a mortgage, security, lien or title interest in the land, building or equipment. "Likewise, HCA's continued ownership of the portion of Lot 1, Block 14 not conveyed to the City in 1980 was confirmed by the City's silence on that point."

The City responds that it presented the superior court with evidence which documented its ownership interests in the land underlying the fish processing plant. The City further asserts that the buildings and facilities located on City-owned land come within the meaning of "real property," since that term has been defined to include things that are permanent, fixed, and immovable.

██ We have adopted a liberal approach in determining whether a particular theory of a case was raised in a lower court proceeding. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska

1985). Thus, we will consider a theory if "it is closely related to [plaintiff's] trial court theory and could have been gleaned from the pleadings." *Id.* Moreover, "[t]he appellant need not have expressly presented every theory supporting an argument before the trial court, but can expand or refine details of an argument otherwise preserved on appeal." *Id.; see also Deal v. State*, 626 P.2d 1073, 1077 (Alaska 1980).

██ Review of the record indicates that the City owns title to all of the land underlying the seafood processing complex. The fish processing plant was built on City-owned tidelands identified in Alaska Tidelands Patent No. 270 and Alaska Tidelands Survey No. 270, and on that portion of Lot 1, Block 14, which was conveyed by quitclaim deed to the City by HCA. The City leased these lands to Hydaburg IRA Council. The lease agreement contained the following provision:

> Permanent building and utilities on expiration, termination or cancellation of this lease shall become property of the City. Provided, if this lease be declared void by a court of law, all improvements of whatever nature on Site shall become the property of the City that the City may best give effect to the purposes for which this lease is granted.

In *Interior Energy v. Alaska Statebank*, 771 P.2d 1352, 1356 (Alaska 1989), we approved of the approach taken by the Restatement (Second) of Property § 12.2(4) regarding the right of a tenant to remove permissible annexations to real estate. "Section 12.2(4) would allow the tenant to remove any permissible annexations *so long as the landlord and tenant have not agreed otherwise* and so long as the freehold can be restored to its former condition." (Emphasis added).

██ In this case it is clear from the lease provisions quoted above that it was the

---

6. Appellees contend that the City's only arguments were as follows:

(1) The HCA plant was part of a 20 year development plan that included projects involving the City, hence the City had some interest in the HCA plant;

(2) the City administered the HCA grants and this somehow gave it an interest in the property; and

(3) the City contributed $205,000 worth of office repairs and electrical work to the HCA plant.

parties' intent that "[p]ermanent buildings and utilities on expiration, termination, or cancellation of this lease shall become the property of the City." Thus, in Restatement terms, the parties have "agreed otherwise" and the tenant, HCA, loses any claim of ownership to the permanent buildings and utilities when the lease ends.[7]

For the above reasons, we conclude that the superior court erred in holding that the City did not have an equitable or legal interest in the property sought to be executed on by Hydaburg Fisheries.

### III. DID THE SUPERIOR COURT ERR IN HOLDING THAT EDA DID NOT HAVE A REVERSIONARY INTEREST IN THE COLD STORAGE EQUIPMENT?

EDA argues first that "no property interest of the United States can be subjected to judicial process without consent of the sovereign." *See Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 20–21, 11 L.Ed. 857 (1846). EDA asserts that the federal government has not given its consent in this case. *See* 42 U.S.C. § 3211(11) (1977).

EDA further asserts that the Public Works Act does not authorize the federal government to allow appropriated funds to be used to pay creditors of the grantee unless a creditor incurs an expense specifically authorized by the grant and applicable regulations. *See* 13 C.F.R. § 305.62–305.63. EDA supports this proposition by emphasizing the detailed regulations which governed HCA's expenditure of federal funds in order to ensure that such funds were used for approved purposes.

EDA argues that the highly specific controls on HCA's use of funds are similar to the controls found by the court in *In re*

*Joliet–Will County Community Action Agency,* 847 F.2d 430, 432 (7th Cir.1988), to be sufficient to make the grantee a mere trustee of grant property. EDA contends that federal cases "make clear that where a grant imposes detailed controls on a grantee's use of funds, the grantee, in effect, serves as a trustee for property purchased with grant funds, even where title to the property is nominally vested in the grantee." *See e.g. In re Joliet–Will County Community Action Agency,* 847 F.2d at 432; *Henry v. First Nat'l Bank of Clarksdale,* 595 F.2d 291, 308–09 (5th Cir.1979); *Palmiter v. Action, Inc.,* 733 F.2d 1244, 1249–50 (7th Cir.1984), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). EDA argues that the trial court made no effort to explain why the reversionary interest analysis set forth in these cases does not apply here.

EDA additionally contends that the federal policy inherent in protecting grant funds for the purposes specified in the grant must take priority over any competing interests of a grantee's creditors. EDA argues:

[T]he specific purpose of the grant money awarded to HCA was to reduce unemployment by enabling local communities "to help themselves achieve lasting improvement and enhance the domestic prosperity by the establishment of stable and diversified local economies and improved local conditions." 42 U.S.C. § 3121. That purpose is not served by allowing the value of property purchased with grant funds to fall to a judgment creditor of the grantee.

Appellees argue that EDA's sovereign immunity argument is misplaced because the Supreme Court of the United States has held that garnishment actions may be

---

**7.** Our decision is also supported by *Pacific Metal Co. v. Northwestern Bank of Helena,* 667 P.2d 958 (Mont.1983), where the court considered whether a building constructed on leased real property was "real property" or "personal property" for purposes of judgment execution. The Montana court applied the following three-prong test for determining the status of the structure: "(1) annexation to the realty, (2) an adaption to the use to which the realty is devoted and (3) intent that the object become a permanent accession to the land." *Pacific Metal Co.,* 667 P.2d at 961 (quoting *Grinde v. Tindall,* 172 Mont. 199, 562 P.2d 818, 820 (1977)). The court stressed that of the three, "the intent of the parties has the most weight and is the controlling factor." *Id.* The court then looked to the lease agreement to determine the intent of the parties, and made its decision accordingly. *Id.* We agree with and adopt the Montana Supreme Court's approach.

brought in state court against federal agencies that may sue or be sued. *FHA v. Burr*, 309 U.S. 242, 244, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940); *Franchise Tax Board of California v. United States Postal Service*, 467 U.S. 512, 517, 104 S.Ct. 2549, 2552, 81 L.Ed.2d 446 (1984). Appellees note that section 701(11) of the EDA legislation empowers the Secretary of Commerce to "sue and be sued in any court of record of a State having general jurisdiction...." 42 U.S.C. § 3211(11). Appellees insist that "[t]he provision in the statute that no collection process may be issued against 'the Secretary or his property' does not apply where, as here, EDA has failed to show that the property belongs to it."

Appellees challenge EDA's assertion that its interest is superior to that of Hydaburg Fisheries because the cold storage equipment was purchased with federal grant money. Appellees argue that under federal property management standards, personal property is classified as either "expendable" or "nonexpendable." Appellees contend that the storage equipment fits the definition of "nonexpendable personal property," namely, "tangible personal property having a useful life of more than one year and an acquisition cost of $300 or more per unit." Appellees argue that absent a specific reservation of an interest by the government, a grant recipient takes title to nonexpendable personal property upon acquisition.

Appellees rely upon the OMB Circular, which states:

> *Exempt property.* When statutory authority exists title to nonexpendable personal property acquired with project funds shall be vested in the recipient upon acquisition unless it is determined that to do so is not in the furtherance of the objectives of the Federal sponsoring agency. When title is vested in the recipient the recipient shall have no other obligation or accountability to the Federal Government for its use or disposition except as provided in 6a below.

OMB Circular A–102, § 5.

Paragraph 6a provides:

> For items of nonexpendable personal property having a unit acquisition cost of $1,000 or more, the Federal agency may reserve the right to transfer the title to the Federal Government or to a third party named by the Federal Government when such third party is otherwise eligible under existing statutes.

Appellees take the position that EDA failed to comply with its own regulatory requirements for reserving an interest in the cold storage equipment. Appellees further contend that EDA failed to meet its burden of proof in the superior court that it had reserved rights in the HCA cold storage equipment. Lastly, Appellees argue that the public interest would best be served by allowing them to levy on the cold storage equipment because it allows a new owner to place the plant back in service.

■ EDA's sovereignty argument relies upon a finding that the government has a reversionary property interest, which is the precise issue now on appeal. While the regulations and the circular on which EDA relies seem vague, poorly designed to impart notice to potential creditors, and in general unbusinesslike as means by which to secure an interest in property, federal case law has not found these shortcomings to be dispositive. Although the question is extremely close, we have decided to follow the approach mapped by such cases as *In re Joliet–Will County Community Action Agency*, 847 F.2d 430, 432 (7th Cir.1988). Whether the government retains a reversionary interest in the property depends "on the terms under which the grants were made." *In re Joliet–Will County Community Action Agency*, 847 F.2d 430, 432 (7th Cir.1988). Federal authorities make clear that the government retains a reversionary interest in property purchased with grant money where "extensive and detailed regulations govern [the grantee's] expenditure of federal funds in order to ensure the use of grant funds for approved purposes ... [and where the grantee was required to] undergo an annual audit to determine whether it has spent grant funds in a fashion consistent with 'applicable laws, regulations and directives.'" *Henry v. First*

*Nat'l Bank of Clarksdale,* 595 F.2d 291, 308–09 (5th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1981); *see also Palmiter v. Action Inc.,* 733 F.2d 1244, 1247–50 (7th Cir.1984) (pervasive federal supervision of a grantee's expenditures of grant funds makes those funds immune from garnishment by a judgment creditor to the extent those funds are not used for authorized grant purposes). In essence, the grant recipient becomes a "trustee" of the grant property. *See In re Joliet–Will County Community Action Agency,* 847 F.2d at 432; *Henry v. First Nat'l Bank of Clarksdale,* 595 F.2d at 308–09.

█ In the instant case HCA was subject to numerous "conditions" in its receipt of grant funds from the EDA which imposed minute controls on the use of the grant, such that the recipient had very little discretion. Specifically, the Grant Agreement required HCA to comply with state and federal law, the Public Works Act, 42 U.S.C. § 3121–3246h, and implementing regulations at 13 C.F.R. Parts 301–18. These statutes and regulations imposed detailed controls on HCA's use of grant funds to ensure that property acquired with such grants would be used for approved purposes. Such controls created a reversionary interest in the federal government in the event such conditions were not met.[8] Thus we hold that EDA has a reversionary interest in the cold storage equipment at issue here.

**Conclusion**

I. The superior court erred in ruling that the City lacked standing to raise issues concerning its interests in the land, building, and fixtures.

II. The superior court erred in ruling that the City lacked any equitable or legal interests in the land and building in question.

III. The superior court erred in ruling that EDA did not possess a reversionary interest in the cold storage equipment purchased with Federal grant funds.

IV. We affirm the superior court's determination that the refrigeration and cold storage equipment was moveable equipment not affixed to realty. The City's alleged property interest in refrigeration and seafood processing equipment turns on whether the equipment is deemed to be annexed or affixed to real property or whether it is moveable personal property. Review of the record shows that the City was permitted to participate in the hearing held on this issue. The superior court's determination is amply supported by the record and thus we affirm the superior court's determination.

**REVERSED** in part, **AFFIRMED** in part, and **REMANDED** for further proceedings consistent with this opinion.

COMPTON, J., not participating.

█

---

**8.** Implicit in this holding is our rejection of appellees' contention that EDA failed to comply with its own regulations governing reservations of interests in equipment. In our view paragraph 5 of attachment N, OMB Circular A–102 is inapplicable; rather paragraph 6 ("other non-expendable property") governs. This paragraph provides that "[w]hen other non-expendable tangible property is acquired by a grantee with project funds title shall not be taken by the Federal Government but shall vest in the grant- ee subject to [enumerated] conditions." Paragraph 6(c)(2) requires that the grantee compensate the granting agency when the grantee no longer needs non-expendable personal property with a unit acquisition cost of $1,000 or more for the purposes specified in paragraph 6. Paragraph 6(b)(1) requires that the grantee "use the property in the project or program for which it was acquired as long as needed."

These conditions demonstrate that HCA only had nominal title to the cold storage equipment.