**NENANA FUEL CO., INC.,**
**Appellant/Cross–**
**Appellee,**

v.

**NATIVE VILLAGE OF VENETIE, a Native Corporation and Native Village of Venetie Tribal Government, Appellees/Cross–Appellants.**

**NENANA FUEL CO., INC., Appellant,**

v.

**NATIVE VILLAGE OF VENETIE, a Native Corporation, and Native Village of Venetie Tribal Government, Appellees.**

**Nos. S–3709, S–3721 and S–4299.**

Supreme Court of Alaska.

July 24, 1992.

Marilyn J. Kamm, Call, Barrett & Burbank, Fairbanks, for appellant/cross-appellee in Nos. S–3709, S–3721, and appellant in No. S–4299.

Judith K. Bush, William Caldwell and Carol Daniel, Alaska Legal Services Corp., Fairbanks, for appellees/cross-appellants in Nos. S–3709, S–3721 and appellees in No. S–4299.

D. Rebecca Snow, Asst. Atty. Gen., Fairbanks, Douglas M. Mertz, Asst. Atty. Gen., and Douglas B. Baily, Atty. Gen., Juneau, for amicus curiae, State of Alaska.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

PER CURIAM.

## I. INTRODUCTION

This appeal comes after the superior court set aside a default judgment against the Native Village of Venetie Tribal Government (Tribal Government) and the Native Village of Venetie (Village Corporation). The court determined that the Tribal Government was a sovereign entity and therefore entitled to sovereign immunity. The court found that the Village Corporation was also a sovereign entity, but that it had waived its immunity when it adopted a "sue and be sued" clause in its corporate charter. Judge Greene stayed Nenana Fuel's action against the Village Corporation, ordering that it exhaust its tribal court remedies before proceeding in state court.

Nenana Fuel appealed the court's finding that the Tribal Government and the Village Corporation were entitled to sovereign immunity. Nenana Fuel argued in the alternative that the Tribal Government waived its sovereign immunity when it agreed to the remedies on default clause contained in a note and security agreement signed by the parties. Moreover, Nenana Fuel contended that this waiver pertained to Venetie's tribal courts, and that the order to exhaust tribal remedies was therefore improper. The Tribal Government and the Village Corporation cross-appealed the superior court's ruling that the "sue and be sued" clause of the Village Corporation's corporate charter was sufficient to waive its sovereign immunity.

Nenana Fuel subsequently obtained a stay of appeal, claiming that it had discovered new evidence which indicated that the Tribal Government and the Village Corporation had misrepresented their history to the court, and that they were not sovereign entities. This evidence consisted of documents and other evidence attached to the State of Alaska's Motion for Summary Judgment in an unrelated federal case, *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie*, No. F87–051 CIV (D. Alaska, motion filed July 6, 1990). Based on this new evidence, Nenana Fuel filed a motion for relief from the superior court's earlier decision. The trial court denied that motion.

Nenana Fuel appeals that decision. Its appeal has been consolidated with the other issues pending in this litigation. We reverse.

## II. FACTS AND PROCEEDINGS

### A. Facts

Nenana Fuel sold fuel to the Tribal Government and Village Corporation in September 1984, when Venetie was expanding the airstrip at Arctic Village. The fuel was used to power equipment used on the site. The Tribal Government and the Village Corporation executed a Promissory Note and Security Agreement for the payment due Nenana Fuel for the fuel. The Tribal Government and the Village Corporation failed to pay Nenana Fuel as agreed in the promissory note. After unsuccessfully attempting to obtain possession of the collateral provided for in the Security Agreement, Nenana Fuel sought relief in the superior court.

At trial, both Nenana Fuel and the superior court accepted the representations made by the Tribal Government and the Village Corporation as to their history. The following history was therefore unquestioned. In 1940, the Secretary of the Interior approved the Village's constitution pursuant to § 16 of the Indian Reorganization Act (IRA), 25 U.S.C. § 461 *et seq.* (1982), 48 Stat. 988 (1934), and the Tribal Government has functioned since that time

under this federal authority. In 1940, the Village also incorporated under § 17 of the IRA, which empowers it through its charter, constitution and bylaws to transact business for the village.

In 1943, at the request of the people from the Native Villages of Venetie, Arctic Village, Christian Village and Robert's Fish Camp, the Secretary of the Interior withdrew the 1.4 million acre Venetie reservation for the use and occupancy of the Natives of those villages, pursuant to the authority vested in him by 48 U.S.C. § 358(a) (repealed 1976). Congress revoked this reservation in 1971 by enacting § 19(a) of the Alaska Native Claims Settlement Act (ANCSA). *See* 43 U.S.C. § 1618 (1988).

Rather than participate in the regional corporation scheme established by ANCSA, the Natives of Venetie and Arctic Village elected to take fee title to their reservation lands pursuant to § 19(b) of ANCSA, 43 U.S.C. § 1618(b) (1988). Upon the federal government's conveyance of these lands in December 1979, the ANCSA village corporation deeded the lands to the Tribal Government. The Tribal Government has owned the former reservation lands in fee since that time.

### B. Procedural Background

In February 1987, Nenana Fuel filed a complaint in superior court alleging that the Village Corporation and Tribal Government owed it $134,128.17 plus interest and costs under the promissory note and security agreement signed by the parties. In June 1987, the superior court entered a default judgment against both defendants.

When the judgment was not satisfied, the superior court ordered a judgment debtor examination of both the Tribal Government and the Village Corporation. Neither defendant appeared for the examination. Pursuant to Nenana Fuel's motion, the court then entered an order to show cause why the Tribal Government and the Village Corporation should not be held in contempt for failing to appear at the judgment debtor examination.

The Tribal Government and the Village Corporation filed a memorandum in opposition to Nenana Fuel's motion for an order to show cause, arguing that the superior court lacked subject-matter jurisdiction over the controversy due to tribal sovereign immunity. Nenana Fuel replied that the Tribal Government and the Village Corporation had waived any sovereign immunity by failing to raise that defense during the pendency of the underlying suit, and that the Village Corporation had also waived any sovereign immunity by including a "sue and be sued" clause in its corporate charter.

The Tribal Government and the Village Corporation then moved to set aside the default judgment against them. They also moved to dismiss Nenana Fuel's complaint, claiming sovereign immunity and insufficiency of process. In April 1988, the trial court ruled that the defendants were entitled to sovereign immunity. It then dismissed the complaint as to the Tribal Government. However, the court found that the "sue and be sued" clause of the Village Corporation's charter was sufficient to waive the Village Corporation's sovereign immunity. The court ruled that the effect and extent of that waiver would be determined after further briefing and argument by the parties.

Nenana Fuel argued that the Village Corporation's waiver was a general one, and that suit in state superior court was therefore proper. The Village Corporation contended that the "sue and be sued" clause must be interpreted by the Tribal Government. If it did constitute a waiver, the clause would permit suit only in its own tribal courts.

After this court's May 1988 decision in *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32 (Alaska 1988), the superior court reinstated the Tribal Government as a party to the action and again heard argument as to whether the Tribal Government was a sovereign entity. In its supplemental brief on this question, the Tribal Government claimed that, because it had a constitution adopted pursuant to the IRA and a reservation prior to the enactment of ANCSA, it

was a self-governing tribe entitled to sovereign immunity.

In March 1989, the superior court ruled that, even after *Stevens Village*, the Tribal Government was a sovereign entitled to immunity from suit. Because the court found that the Tribal Government had not waived its immunity, it again dismissed the case as to the Tribal Government. The court reaffirmed its earlier ruling that the "sue and be sued" clause of the Village Corporation's charter acted as a waiver of the Corporation's sovereign immunity.

In November 1989, the superior court set aside the default judgments against both the Village Corporation and the Tribal Government. The court dismissed the action against the Tribal Government, on the basis of its ruling that the Tribal Government possessed sovereign immunity. After asserting that it had subject-matter jurisdiction over the lawsuit, and that it therefore had the authority to resolve the issues of sovereign immunity and the nature and effect of the "sue and be sued" clause in the Village Corporation charter, the court then stayed the action against the Village Corporation with the order that Nenana Fuel exhaust its tribal court remedies.

Nenana Fuel appealed this decision. The Tribal Government and the Village Corporation cross-appealed the superior court's assertion of jurisdiction and determination that the Village Corporation waived its sovereign immunity.

During the course of this appeal, Nenana Fuel learned of documents filed by the State of Alaska in a federal district court case, *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie*, No. F87–051 CIV (D. Alaska, motion filed July 6, 1990), which contradict some representations made by Venetie concerning its history. Because the superior court's earlier decision was based in part on the Tribal Government's claim that it is an IRA organization and that its constitution and by-

laws were approved by the Secretary of the Interior in 1940, Nenana Fuel requested relief from the court's ruling under Civil Rule 60(b). The superior court denied that motion.

## III. DISCUSSION

### A. The Remedies on Default Clause Constitutes an Express Waiver of Venetie's Sovereign Immunity

■ Nenana Fuel argues that the Remedies on Default clause contained in the note and security agreement effected a waiver of any sovereign immunity possessed by the Tribal Government and the Village Corporation (collectively referred to as Venetie). That clause provides:

> On the occurrence of a default and after any notice required ... and in addition to any remedies described in the Note, [Nenana Fuel] ... may:
>
> (a) bring an action upon the Note;
>
> .    .    .    .    .
>
> (d) dispose of the collateral in any commercially reasonable manner and, in the event of a deficiency, bring an action against Debtors for that deficiency;
>
> .    .    .    .    .
>
> (f) invoke any other remedy provided by law or this agreement; and
>
> (g) invoke any combination of these remedies allowable under Alaska law.

Venetie argues that this clause contains no express waiver of its immunity, and that a waiver of sovereign immunity cannot be implied.[1] *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978) (a waiver of sovereign immunity cannot be implied but must be unequivocally expressed).

In *Native Village of Eyak v. GC Contractors*, 658 P.2d 756 (Alaska 1983), we held that a tribe waives its sovereign immunity by agreeing to contract terms inconsistent with sovereign immunity. Eyak

1. Venetie also contends that, even if the contract contains an express waiver, the three Tribal Government Council members who signed the document had no authority to waive the Tribal Government's immunity without obtaining a resolution of the entire Tribal Government. While this may be true, Venetie waived this argument by failing to raise it before the superior court.

had entered into a contract with GC Contractors under which GC Contractors was to build a community center for Eyak. Pursuant to an arbitration clause in the contract, the parties submitted to arbitration a dispute concerning Eyak's failure to pay money due under the contract. The arbitrator awarded GC Contractors the full sum sought, and rejected Eyak's argument that it would not be bound by any arbitration decision on the grounds of sovereign immunity. Adhering to the general rule that all provisions in a contract should be found meaningful, we affirmed the superior court's confirmation of the arbitration award. *Id.* at 760.

The United States Court of Appeals for the Ninth Circuit reached the opposite result in *Pan American Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416, 418–20 (9th Cir.1989), holding that an arbitration clause in a management agreement between an Indian tribe and the non-Indian operator of the tribe's bingo enterprise did not constitute a waiver of the tribe's sovereign immunity. We distinguished *Pan American* from *Eyak* in *Hydaburg Coop. Ass'n v. Hydaburg Fisheries*, 826 P.2d 751 (Alaska 1992), however, noting that *Pan American* involved a challenge to the tribe's authority to regulate affairs on its reservation, and did not involve a suit to compel arbitration or enforce an arbitration award. *Id.* at 754–55. We stated: "Arguably, even under *Pan American* an agreement to arbitrate disputes arising out of a contract constitutes a tribe's consent to suit for the limited purposes of compelling arbitration or enforcing an arbitration award." *Id.* at 754. We also noted that "[t]his principle is well established in situations involving foreign sovereigns." *Id.* (citing Restatement (Third) of the Foreign Relations Law of the United States § 456(2)(b) (1987)).

In the present case, the language of the Remedies on Default clause in the parties' security agreement clearly expresses a waiver of immunity. In the event of default, it authorizes Nenana Fuel to "bring an action upon the Note" or to invoke any other remedy "allowable under Alaska law." As we stated in *Eyak*, all provisions in a contract should be found meaningful to the extent possible. 658 P.2d at 760. We therefore must read the Remedies on Default clause as expressly waiving any sovereign immunity which Venetie might possess, and referring actions based upon the contract to Alaska courts for application of Alaska law. Accordingly, we find that neither the Tribal Government nor the Village Corporation is entitled to sovereign immunity in this case.

Because we find that the Remedies on Default clause constitutes an express waiver of any sovereign immunity possessed by Venetie, we do not consider whether the Tribal Government and Village Corporation actually constitute sovereign bodies. For the same reason, we need not examine the nature and effect of the "sue and be sued" clause in the Village Corporation's charter.

**B. The Superior Court Erred In Requiring Exhaustion Of Tribal Court Remedies**

■ The superior court ruled that it had jurisdiction over this case because the Village Corporation had waived its sovereign immunity. However, the court stayed the action against the Village Corporation and ordered that Nenana Fuel exhaust its tribal court remedies. In making this holding, the court invoked the doctrine of comity enunciated in *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and refined in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

However, the consent to suit in the Remedies on Default clause was in no sense limited to the tribal court. Venetie agreed that Nenana Fuel could "bring an action upon the note" without restricting jurisdiction to any particular forum. Reference to Alaska law in part (g) of the clause makes it clear that an action in Alaska's courts was within the contemplation of the parties. Therefore we find that the superior court erred in ordering Nenana Fuel to exhaust its remedies in tribal court. Furthermore, we note that the superior court's order was erroneous because there has

been no showing that Venetie has a functioning tribal court, and because there has been no showing of what the jurisdiction of such an entity might be.[2]

REVERSED and REMANDED for proceedings in accordance with this opinion.

MOORE, J., concurs.

RABINOWITZ, C.J., dissents.

MOORE, Justice, concurring.

I agree with the court's finding that the Remedies on Default clause waived any sovereign immunity possessed by Venetie. I also agree with the court's conclusion that the superior court erred in ordering exhaustion of tribal court remedies. In *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856, 105 S.Ct. 2447, 2453, 85 L.Ed.2d 818 (1985), the Supreme Court declared that the examination of a tribal court's civil subject-matter jurisdiction "should be conducted in the first instance in the Tribal Court itself." The Court reiterated this doctrine in *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976 n. 8, 94 L.Ed.2d 10 (1987), stating that "[e]xhaustion is required as a matter of comity...." This comity "arises out of the 'attributes of sovereignty' possessed by Indian tribes, their 'inherent powers' of self-government, and the 'vital role' of tribal courts in that process." *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie*, 856 F.2d 1384, 1388 (9th Cir.1988) (citing *National Farmers*, 471 U.S. at 851, 856, 105 S.Ct. at 2451, 2453, and *LaPlante*, 480 U.S. at 14–19, 107 S.Ct. at 975–78).

Before a state court can require the exhaustion of tribal court remedies, however, it must find that a legitimate tribal court exists. *See Chilkat Indian Village v. Johnson*, No. J84–024 Civ., order at 10 (D.

Alaska, Jan. 11, 1990) ("[E]xhaustion will not be required where an assertion of tribal jurisdiction ... would be futile because of a lack of adequate opportunity to challenge tribal jurisdiction, as where, for example, a tribe lacks an operational court system."). For a tribal court to be legitimate, it must serve a federally recognized tribe which occupies a territory over which it has governmental authority, *see State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie*, 856 F.2d at 1388, and it must be established and able to entertain suits. *See Chilkat Indian Village v. Johnson*, No. J84–024 Civ., slip op. at 19 (D. Alaska, Oct. 9, 1990). A court established by a non-tribal entity is obviously not legitimate, since a non-tribal entity may not establish courts in which a state or federal court can require the exhaustion of remedies.[1] *State of Alaska ex rel. Yukon Flats School Dist.*, 856 F.2d at 1388.

I write separately, however, because I believe the court has failed to address the crucial issue presented by this appeal, whether Venetie is an Indian tribe entitled to sovereign immunity. To date, no court has expressly considered whether a Native group which once resided on a federally recognized reservation in Alaska constitutes a sovereign Indian tribe after the passage of ANCSA. The primary reasons for this reluctance are the complexity and political nature of the questions involved. The unfortunate result of this judicial avoidance is that great uncertainty pervades the Natives' economic dealings and jeopardizes beneficial legislation in the state legislature. In an attempt to partially remedy this situation, I will confront head-on the question of whether Venetie is an Indian tribe entitled to sovereign immunity.

The superior court determined that Venetie meets the criteria for sovereignty set

---

**2.** Because the trial court did not base its decision on the Remedies on Default clause, it did not consider the relationship between that clause and the doctrine of exhaustion of remedies. We believe that comity principles are inapplicable when a party brings a legal action in state court pursuant to a contractual provision permitting the invocation of remedies under state law.

**1.** The mere fact that an Alaska Native village is organized under the IRA is not evidence of tribal status, since portions of the IRA applicable to Alaska Natives allow Native entities that do not constitute tribes to organize pursuant to the IRA. *See infra* note 5 & accompanying text.

forth in *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32 (Alaska 1988) and therefore falls within an exception to the general rule that Native groups in Alaska are not sovereign tribes. The court concluded that the Tribal Government has explicit powers of self-government pursuant to Article 4 of its constitution.[2] The court further determined that Venetie meets the reservation requirement of *Stevens Village*. It noted that the Secretary of the Interior created the Venetie Reservation under the Alaska Indian Reorganization Act and that the villagers protested its termination when ANCSA became effective in 1971. Because the ANCSA village corporations within the former Venetie Reservation elected to acquire fee title to those lands and then to deed title to the Tribal Government, the court concluded that ANCSA's termination of the reservation did not abolish the sovereign immunity previously held by the entire Venetie IRA organization.

Nenana Fuel contests this ruling on several grounds. First, it claims that Venetie does not meet certain prerequisites to sovereignty as described in *Stevens Village*. It also claims that any sovereignty Venetie had was extinguished when its reservation was terminated by ANCSA. Finally, Nenana Fuel contends that Public Law 280 stripped the Village Corporation and Tribal Government of any jurisdiction they may have had over this litigation.

It has long been recognized that American Indian tribes outside Alaska are immune from suit due to their status as sovereign governmental entities. *See Three Affiliated Tribes of Fort Berthold Reserv'n v. Wold Eng'g*, 476 U.S. 877, 891–92, 106 S.Ct. 2305, 2313–14, 90 L.Ed.2d 881 (1986); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978); *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940). Courts also have consistently recognized that Alaska Native groups have a very different history than Natives in the lower forty-eight states; their interactions with the federal government have been very different from those between the government and tribes of other states. *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 50–51, 82 S.Ct. 552, 556–57, 7 L.Ed.2d 562 (1962); *Stevens Village*, 757 P.2d at 35; *Atkinson v. Haldane*, 569 P.2d 151, 154 (Alaska 1977). As the United States Supreme Court stated in *Metlakatla*,

> There were no Indian wars in Alaska, although on at least one occasion, see Gruening, The State of Alaska (1954), pp. 36–37, there were fears of an uprising. There was never an attempt in Alaska to isolate Indians on reservations. Very few were ever created, and the purpose of these, in contrast to many in other States, was not to confine the Indians for the protection of the white settlers but to safeguard the Indians against exploitation. Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government.

*Metlakatla*, 369 U.S. at 51, 82 S.Ct. at 557. Because the land resources of Alaska appeared limitless in the early days of the territory, "the westward migration of white civilization which displaced the tribes [of the lower forty-eight states] never occurred in Alaska." *Atkinson*, 569 P.2d at 154. And, due to the non-hostile history of Alaska's settlement, the federal government never attempted to enter into treaties with Alaska Natives. *Id.* As a result of these circumstances, most of the facts which created the Indian law authority of the lower forty-eight states are absent from cases involving Alaska Natives. *See Metlakatla Indian Community v. Egan*, 362 P.2d 901, 920–21 (Alaska 1961), *partially rev'd* 369 U.S. 45, 50–51, 82 S.Ct. 552, 556–57, 7 L.Ed.2d 562 (1962).

We determined in *Atkinson v. Haldane* that the history of the Metlakatla Indian

---

**2.** Included in those powers are the power 1) "[t]o do all things for the common good which [the Village] has done or has had the right to do in the past and which are not against Federal law and such Territorial law as may apply," and

2) "[t]o control the use by members or non-members of any reserve set aside by the Federal Government for the Village and to keep order in the reserve."

Community was much more like the history of Indian tribes of other states than that of other Alaska Native groups, thereby entitling it to sovereign tribal status. *Atkinson*, 569 P.2d at 154–55. Of particular importance to this holding was the fact that the Metlakatlans continued to reside on a federally recognized reservation even after the passage of ANCSA, which abolished all other reservations in Alaska. *Id.; see* 43 U.S.C. § 1618(a) (1988). Our conclusion was further compelled by the strong central tribal government established by the Native community on the reserve. *Atkinson*, 569 P.2d at 156.

In *Stevens Village*, we again acknowledged the unique status enjoyed by the Metlakatla community. 757 P.2d at 36. We emphasized that "judicial recognition of tribal sovereign immunity turn[s] on whether Congress, or the executive branch of the federal government, ha[s] recognized the particular group in question as a tribe." *Id.* at 34–35 (citing *Atkinson*, 569 P.2d at 161–63). After reviewing the history of the relationship between the federal government and Alaska Natives up until the passage of the Alaska Indian Reorganization Act in 1936, 49 Stat. 1250 (1936), we concluded that, with the exception of the Metlakatlans, Congress had intended that Alaska Native groups not be treated as sovereigns. 757 P.2d at 34–41. Further, we determined that neither the IRA nor any subsequent congressional action had signaled recognition of the sovereign status of Alaska Native groups. 757 P.2d at 34.

In arriving at this conclusion, we observed that the Indian Reorganization Act (IRA), 25 U.S.C. § 461 *et seq.* (1982), was "designed to encourage Indians to 'revitalize their self-government through the adop-

tion of constitutions and bylaws and through the creation of chartered corporations, with power to conduct the business and economic affairs of the tribe.'" 757 P.2d at 39 (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1271, 36 L.Ed.2d 114 (1973)). Since § 16 of the IRA applied only to Indian tribes or tribes residing on a reservation,[3] the Act's applicability to Alaska was very limited. Not only were Alaska Native groups not tribes, but there were very few reservations in existence in Alaska. In 1936, § 1 of the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936), extended § 17 of the IRA to Alaska and also expanded the applicability of the Act:

> groups of Indians in Alaska not recognized prior to May 1, 1936 as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district, may organize to adopt constitutions and by-laws and to receive charters of incorporation and federal loans under §§ 10, 16, and 17 ... of the [IRA].[4]

This expanded application of the IRA was deemed necessary because it had been "assumed that Alaska Natives were not members of federally recognized Indian tribes." Report of the Governor's Task Force on Federal–State–Tribal Relations, at 110–11 (Feb. 14, 1986). In *Stevens Village*, we interpreted these circumstances as an express Congressional statement that most Native groups in Alaska had not been recognized as tribes. 757 P.2d at 40.

Following our review of the IRA in *Stevens Village*, we concluded that the Alaska Indian Reorganization Act "expressly states that Native groups in Alaska have not been accorded tribal recognition."[5]

---

**3.** After the initial passage of the IRA in 1934, § 16, but not § 17, was applicable to Alaska.

**4.** The 1936 Act also authorized the Secretary of the Interior to designate Indian reservations in Alaska. Reservations were deemed necessary to protect the economic rights of Alaska Natives, as well as to delineate the geographical limits of Native communities' power of self-government under the IRA. *See* Report of the Governor's Task Force on Federal–State–Tribal Relations,

at 109, 111–12 (Feb. 14, 1986); *Native Village of Stevens v. Alaska Management & Planning,* 757 P.2d 32, 40 (Alaska 1988).

**5.** Venetie urges us to overrule this conclusion. It claims that it is impossible to reconcile the holding of *Stevens Village* with the Ninth Circuit's holding in *Native Village of Noatak v. Hoffman*, 896 F.2d 1157 (9th Cir.1990), *rev'd on other grounds, Blatchford v. Native Village of*

757 P.2d at 40. We found that while the IRA sets forth a means by which such groups might achieve self-governing status, the Native Village of Stevens clearly had not achieved that status. *Id.* at 40–41. This conclusion was based on the fact that the village did not have, and never had, a reservation on which to exercise its governmental powers. *Id.* at 40. We stated: "In our view, the mere approval of a section 16 constitution ... by the Secretary of the Interior ... does not suffice to afford ... tribal status for the purpose of application of the doctrine of tribal sovereign immunity." *Stevens Village,* 757 P.2d at 40. Rather, the existence of a federally recognized reservation was a "necessary precondition to native communities' exercising local government powers under section 16 of the IRA." 757 P.2d at 40. Because this crucial element of sovereignty was lacking in the *Stevens Village* case, we refused to accord sovereign status to the village.

The situation of the Native Village of Venetie lies between the two factual settings presented by the Metlakatla Indian community and the Native Village of Stevens. Unlike Stevens Village, which never possessed a reservation, Venetie once possessed a reservation. That reservation, however, was abolished in 1971 by ANCSA.[6] Due to this fact, Venetie is unlike

*Noatak and Circle Village,* 501 U.S. ——, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

In *Noatak,* the Ninth Circuit identified three bases upon which a court may infer that a tribe has been "duly recognized" by the federal government for purposes of invoking federal jurisdiction under 28 U.S.C. § 1362. *Id.* at 1160. They are: (1) the existence of a village governing body approved by the Secretary of the Interior under § 16 of IRA, 25 U.S.C. § 476; (2) a village's listing as a Native Village under ANCSA, 43 U.S.C. § 1601(b)(1); and (3) on the basis of three recent statutes, the Indian Self–Determination Act, 25 U.S.C. § 450b(e) (1988), the Indian Financing Act, 25 U.S.C. § 1452(c) (1988), and the Indian Child Welfare Act, 25 U.S.C. § 1903(8) (1988). *Id. See Native Village of Venetie I.R.A. Council v. State of Alaska,* 944 F.2d 548 (9th Cir.1991) (relying upon *Noatak* to find that Venetie is a duly recognized tribe under § 1362). *But see Cape Fox Corp. v. United States,* 456 F.Supp. 784, 797–98 (D. Alaska 1978), *rev'd on other grounds,* 646 F.2d 399 (9th Cir. 1981) (holding that ANCSA village and regional corporations are not duly recognized tribes or bands for purposes of 28 U.S.C. § 1362).

I read *Noatak* and *Venetie* as recognizing tribal status only for the limited purpose of establishing federal jurisdiction under § 1362. This conclusion is confirmed by the Ninth Circuit's recent decision in *Native Village of Tyonek v. Puckett,* 957 F.2d 631 (9th Cir.1992), which provides:

> We have held that certain Alaska native villages constitute tribes for the purpose of 28 U.S.C. § 1362 (1988), which provides for federal jurisdiction over civil actions raising a federal question "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior." *Native Village of Venetie I.R.A. Council,* 944 F.2d at 551–52; *Native Village of Noatak,* 896 F.2d at 1160. However, we have not addressed the question whether any Alaskan native village constitutes an Indian tribe for the purpose of sovereign immunity.

*See also Noatak,* 896 F.2d at 1166–67 (Kozinski, J., dissenting). The Ninth Circuit's finding of federal recognition of tribal status for Villages reorganized under § 16 of IRA or listed as Native Villages under ANCSA therefore peacefully co-exists with our ruling in *Stevens Village.* As such, the *Noatak* and *Venetie* decisions have no impact on my decision today.

**6.** The State's pleadings in *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie,* 856 F.2d 1384 (9th Cir.1988), which Nenana Fuel relies on to support its argument that the Village Corporation and Tribal Government are not sovereign entities, cast grave doubt on the Tribal Government's assertions that it is an effective § 16 organization. In that case, the State of Alaska seeks to enjoin the Tribal Government from collecting a business activity tax levied on a contractor who built new school buildings in Venetie. The Ninth Circuit upheld the district court's issuance of a preliminary injunction which prohibits the Tribal Government from conducting further enforcement proceedings during the pendency of the case. The parties subsequently filed cross-motions for summary judgment on July 6, 1990.

In the State's cross-motion, the State alleged that the Tribal Government does not have an IRA constitution, that the Tribal Government is not a traditional government since it only came into existence in 1976, and that the Tribal Government is essentially defunct as it has no assets other than paper title to land in the area. The State also raised a question as to the validity of the Tribal Government's title to the former reservation land since the ANCSA village corporations of Venetie and Arctic Village deeded the property to the Tribal Government before they received the patent to the land from the federal government.

Moreover, the state argued that since the land was the sole asset of the ANCSA corporations and the membership of the Tribal Government differs from that of the corporations, the trans-

Metlakatla, whose reservation continues to exist pursuant to express congressional recognition in ANCSA. Our inquiries into tribal sovereignty in *Stevens Village* and *Atkinson* therefore provide me with insufficient guidance to resolve Venetie's present claim. Accordingly, I proceed to analyze the question whether a Native group which once resided on a federally recognized reservation in Alaska can constitute a sovereign Indian tribe even after the federal government has expressly terminated the reserve.

I find that Congress expressly pronounced in its 1971 enactment of ANCSA that no Native Alaskan group other than the Metlakatla Indian community of the Annette Island Reserve may be entitled to sovereign tribal status. A review of the history of Alaska's settlement and the goals which ANCSA was intended to pursue makes this conclusion inevitable. As noted previously, the history of Alaska Native groups is extremely different from the history of Indians in the lower forty-eight states. Specifically recognizing this unique history, and in hopes of arriving at a new, more successful means of resolving Native claims, ANCSA expressly rejected the reservation model which settled Native claims in other states.

The legislative history of ANCSA is instructive on this point. In its October 21, 1971 Report to Congress regarding the proposed ANCSA bill, the Committee on Interior and Insular Affairs acknowledged the errors of the past, stating: "The Congress has an opportunity in this last major settlement between the United States and the Native peoples of America to arrive at a more just and hopefully, a wiser resolution than has been typical of our country's history in dealing with Native people in other times and in other states." S.Rep. No. 405, 92d Cong. 1st Sess., at 61–62 (1971). The Committee then identified several major differences between ANCSA and previous Indian settlements. It wrote:

> In several important respects the disposition recommended by the Committee for the Alaska Native land claims differs from previous settlements with Indian groups in the other States. The status of aboriginal claims in Alaska is not burdened with a history of conquest or of treaties between the United States and tribal groups. The status of the land, with minor and manageable exceptions, has not been complicated by the establishment of Indian Reservations.... The most important innovations [in the Committee's proposed bill] are as follows:
>
> (1) The settlement is statewide and applies to all Alaska Native groups; all eligible Natives regardless of their ethnic affiliation or their location are entitled to an equal share in the assets provided as compensation for claims extinguished in the settlement.
> (2) The settlement will with minor exceptions put an end to racial or ethnic distinctions in land tenure or hunting and fishing rights.
> (3) The assets granted to Alaska Natives under the terms of this settlement will be managed and disposed of by them either as individuals or through statewide, regional and local corporations controlled by them.

S.Rep. No. 405, 92d Cong., 1st Sess., at 79–80 (1971).

The Act's legislative history also shows that Congress intended that after ANCSA's enactment there was to be no trust relationship between the federal government and the Native groups of Alaska, as there is between the government and the Native tribes of other states. Congress intended that "lands granted to Natives under this Act [are not to be] considered 'Indian reservation' lands for purposes other than those specified in this Act. The lands granted by this Act are not 'in trust' and the Native villages are not Indian 'reservations.'" H.R.Rep. No. 746, 92d Cong., 1st Sess. 40, *reprinted in* 1971 U.S.C.C.A.N. 2192, 2253. In House consideration of ANCSA, it was again clarified that "[t]he [ANCSA] bill does not establish any trust relationship between the Federal Government and the Natives. The regional

fer could be subject to attack as an illegal trans-          fer of corporate assets.

corporations and the village corporations will be organized under State law, and will not be subject to Federal supervision except to the limited extent specifically provided in the bill. All conveyances will be in fee—not in trust." H.R.Rep. 523, 92d Cong., 1st Sess. 9, *reprinted in* 1971 U.S.C.C.A.N. 2192, 2199.

The legislative history of ANCSA thus reveals both the comprehensive scope of the Act as well as Congress' intention to resolve Alaska Native claims in a new and entirely different manner than was used to resolve the claims of other Indian groups. Due to the specific tailoring of ANCSA to Alaska Native claims, as well as the comprehensiveness of the Act's resolution of those claims, I conclude that ANCSA represents a final and binding settlement of Native claims, including claims of tribal sovereignty.[7]

The actual language of ANCSA is also absolutely inconsistent with the concept that Alaska Native groups carry on as independent and sovereign enclaves entitled to special federal recognition. The Act's preamble unequivocally demonstrates Congress' intention that ANCSA settle "all claims by Natives and Native groups of Alaska," 43 U.S.C. § 1601(a) (1988), and that it accomplish the assimilation of Alaska Natives into society as a whole. Further, in the Act's "declaration of policy," Congress states:

> [T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs

of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, *without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska.*

43 U.S.C. § 1601(b) (1988) (emphasis added). Any finding that ANCSA did not abolish native sovereignty clearly would be at odds with Congress' desire to abolish the reservation system and to avoid prolonged wardship or trusteeship of Alaska Natives.[8]

The substantive provisions of ANCSA further illuminate the irreconcilability of that Act with concepts of tribal sovereignty in Alaska. Significantly, the Act explicitly provides for a privately-owned corporate system of operation rather than a reservation-based tribal system. *See* 43 U.S.C. § 1606 (1988). Section 7 of the Act establishes regional corporations which are organized like any other Alaska corporation, with, for example, articles of incorporation and bylaws, management under a board of directors, and ownership by stockholders. *Id.* The corporations operate the same as other Alaska corporations, with certain limited exceptions such as some restrictions on the alienation of shares. *See* 43 U.S.C.

---

**7.** Justice Matthews discussed ANCSA's termination of tribal sovereign immunity in *Stevens Village,* 757 P.2d at 41 n. 24:

> One purpose served by the doctrine of tribal sovereign immunity is to give special protection to Indian lands and money. *Atkinson v. Haldane,* 569 P.2d at 160. Congress, by granting Alaska Natives' lands and money to state regulated corporations which are not exempt from suit, and without imposing significant restraints on the alienation of lands, has evidently concluded that the special protection of immunity was not necessary or desirable for the great bulk of Native property.

**8.** The Department of Interior (DOI) came to a similar conclusion after the passage of ANCSA when it denied a petition from the Tribal Government to restore the former Venetie reser-

vation to trust status. The DOI found that the election by Venetie and Arctic Village to take their former reservation in fee pursuant to 43 U.S.C. § 1618(b), while rendering the villages ineligible for certain other benefits provided by ANCSA, did not disassociate them from the Act's settlement of all Native claims. Rather, section § 1618 unequivocally expresses Congress' intention to revoke all reservations except the Annette Island Reserve. DOI therefore concluded that the Act did not allow the Natives of Venetie the option of voting for continued trust status, but only allowed them to choose between two competing forms of compensation in settlement of their claims: participating in the regional corporate plan of the Act, or electing to opt-out of that scheme and take fee title to the former reservation land.

§ 1606(h) (1988 & Supp.1992). These provisions make clear that the regional corporations created by ANCSA are business corporations governed by state law, not tribal sovereigns.[9] As Senator Stevens of Alaska stated during the Senate's discussion of the Act:

> [The regional corporations] are not government entities, but they are a part of a profitmaking picture for the native people of Alaska for the future.... It is important for all to note that these are incorporated under the laws of Alaska to conduct business for profit.
>
> They are not government bodies....

117 Cong.Rec. 46,964 (1971).

The village corporations created by the Act are also businesses subject to state law. 43 U.S.C. § 1607 (1988). While these organizations have been endowed with sufficient land and other assets to ensure effective self-determination, *see* 43 U.S.C. §§ 1605 & 1610 (1988); 117 Cong.Rec. 38,-445 (1971) (statement of Senator Harris during Senate debate of the ANCSA bill) (arguing in favor of a generous ANCSA land settlement to ensure adequate power of Native self-determination), they are like the regional corporations in that they possess no sovereign status. *See* 117 Cong. Rec. 46,964 (1971) (statement of Sen. Ste-

vens). In my view, both the regional and village corporate organizations possess no status as governing bodies, but are instead intended to facilitate the assimilation of Native Alaskans into the modern business world.[10]

I find further evidence of Congress' intent to terminate Alaska Native claims to tribal status from the fact that Congress conveyed the land due under the Act to the ANCSA regional and village corporations, not to any governing IRA organizations. *See* 43 U.S.C. § 1611 (1988). Even in the case of villages such as Venetie, which elected not to become part of the regional corporate scheme and to take fee title to certain lands instead,[11] 43 U.S.C. § 1618(b) (1988), Congress conveyed the land due under § 1618(b) to the ANCSA village corporation of Venetie, not to the Venetie IRA organization. Because the membership of these two organizations may differ, I interpret Congress' action as yet another indication that the land conveyed under ANCSA does not and cannot establish boundaries for any tribal entity's jurisdiction.[12]

Finally, and most significantly, ANCSA § 19 specifically revokes all reservations existing in Alaska, with the exception of the Annette Island Reserve occupied by the Metlakatla Indian Community.[13] 43 U.S.C.

---

9. *See* S.Rep. No. 405, 92d Cong., 1st Sess. 80 (1971):

> [T]he assets granted in settlement of the claims will be, or will rapidly become, ordinary and unrestricted forms of property. Organizations established to implement the settlement will have a strictly limited life or will become ordinary public and private corporations operating without any special privileges or restrictions.

10. ANCSA's legislative history reveals Congress' belief that recognition of Native Village corporations in place of the traditional unit in Native society, the village, maximized the local self-determination of Native groups while accomplishing the Act's goal of assimilating Natives into modern society. *See* Report of the Committee on Interior and Insular Affairs, S.Rep. No. 405, 92nd Cong., 1st Sess. at 132 (1971). Organization as a business corporation does not by any means end all Native control over their village affairs. To the contrary, ANCSA has liberally provided for the transfer of land and other assets to ensure that Natives are able to maintain local control over their affairs. That

Act does, however, terminate any claim of tribal status.

11. Notably, ANCSA offered no option to preserve the trust status of any reservation land, with the exception of the Annette Island Reserve occupied by the Metlakatlan Indian community. *See* 43 U.S.C. § 1618 (1988).

12. Because ANCSA terminated the sovereignty of all Native groups in Alaska except the Metlakatlans, Venetie's sovereign immunity has been extinguished regardless of whether title to Venetie's land is held by its ANCSA village corporation or by the Tribal Government.

13. The legislative history of 43 U.S.C. § 1618(a) indicates that the reserves of certain Native groups, such as the Metlakatlans and the Tyonek Indians of the Moquawkie Reserve, were accorded special consideration before that provision was enacted. The Natives of Venetie apparently were not accorded this special consideration. *See* S.Rep. No. 405, 92nd Cong., 1st Sess. at 44 (1971). The final ANCSA bill granted the Metlakatlans' request for an exemption from

§ 1618(a) (1988). ANCSA therefore abolishes all claims to tribal status and sovereignty by Alaska Natives other than the Metlakatlans, since federal recognition of a reservation is a necessary prerequisite to judicial recognition of Alaskan tribal sovereignty.[14] *See Mescalero Apache Tribe,* 411 U.S. at 148–49, 93 S.Ct. at 1270–71. ("Absent express federal law to the contrary, Indians going beyond reservation bound-

aries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the state."); *Stevens Village,* 757 P.2d at 41. If Venetie's claim to sovereignty were recognized in the absence of a federally recognized reservation, it would be impossible to ascertain what boundaries defined the area of Venetie's jurisdiction.[15]

revocation of their reservation. 43 U.S.C. § 1618(a) (1988).

**14.** The United States Supreme Court has repeatedly linked the concept of Indian sovereignty with that of reservations:

> [The Indian sovereignty doctrine] has undergone considerable evolution in response to changed circumstances. As noted above, the doctrine has not been rigidly applied in cases where Indians have left the reservation and become assimilated into the general community. Similarly, notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians.... Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.

> Finally, the trend has been away from the idea of inherent sovereignty as a bar to state jurisdiction and toward reliance on federal preemption. [footnote omitted] The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.[8]

> [8] The extent of federal pre-emption and residual Indian sovereignty in the total absence of federal treaty obligations or legislation is therefore now something of a moot question.

*McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 172–73, 93 S.Ct. 1257, 262–63, 36 L.Ed.2d 129 (1973) (citations omitted). *See also Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation,* 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (implying that tribal jurisdiction ends beyond the boundaries of the reservation); *Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981) (identifying three situations in which a tribe can assert jurisdiction over a non-member: where the non-member was engaged in activities on reservation lands; where the non-member had consensually entered into a relationship with the tribe subjecting himself to tribal jurisdiction; or where the non-member was acting on fee lands within the reservation and those activities posed a direct threat to the health and welfare of the tribe).

In short, the Court increasingly looks to specific federal statutes or treaties granting tribal authority or limiting state authority when deciding Indian jurisdictional questions, instead of

relying on the outdated notion of sovereign immunity. When analyzing the applicable federal law, the Court first looks to any authority establishing a reservation. This approach was particularly evident in the companion cases of *Metlakatla Indian Community v. Egan,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), and *Organized Village of Kake,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). Those cases arose from this court's decision that the villages involved had no separate jurisdiction which would immunize them from state law prohibiting the use of fish traps. *Metlakatla Indian Community v. Egan,* 362 P.2d 901 (Alaska 1961), *partially rev'd,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962). The Supreme Court partially overruled this decision, holding that the reservation community of Metlakatla had separate authority derived from federal law as a result of its reservation, but that the non-reservation villages of Kake and Angoon possessed no such authority. Significantly, the Court affirmed that portion of our decision pertaining to Kake and Angoon, holding that the federal permits under which the Indians fished did not grant a right to be free of state regulation, and that the state has the power to regulate the off-reservation fishing by Indians.

The Department of the Interior has also recognized that only those Alaska Native communities which inhabit reservations are entitled to sovereign immunity. In its "Instructions for Organizing in Alaska under the Indian Reorganization Act as amended for Alaska," the Department of the Interior stated unequivocally that government powers are available to IRA councils only on reservations. *Report of the Governor's Task Force* 113–15 (December 22, 1937).

**15.** As Secretary Ickes stated in his letter to the House Committee on Indian Affairs accompanying § 2 of the Alaska Indian Reorganization Act: "[I]f native communities of Alaska are to set up systems of local government, it will be necessary to stipulate the geographical limits of their jurisdictions. Reservations set up by the Secretary of the Interior will accomplish this." H.R.Rep. No. 2447, 74th Cong., 2d Sess. 3–5 (1936) (letter from Harold Ickes to Honorable Will Rogers), *reprinted in Report of the Governor's Task Force on Federal–State–Tribal Relations,* at 112 (Feb. 14, 1986). *See also Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483

In summary, after *Stevens Village* there remains no question that Venetie's organization under the IRA is alone insufficient to support a finding of sovereignty. Moreover, ANCSA, the most far-reaching federal legislation ever to affect Alaska Natives, reveals Congress' express intent that no Native Alaska group other than the Metlakatla Indian community may be entitled to sovereign tribal status. Congress envisioned state regulatory authority over almost all Native-owned lands and Native corporations, and mandated involvement by the state in the affairs of all Native villages. Federal trusteeship and reservations were terminated, and permanent racially-defined institutions were abolished. Because there is nothing in the language or legislative history of ANCSA which remotely suggests that Congress intended IRA villages to have a governmental role over the lands conveyed under ANCSA, I would accord Venetie no such role. I would hold that neither the Tribal Government nor the Village Corporation is entitled to sovereign immunity.

Venetie argues that the *Stevens Village* court analyzed ANCSA for purposes of confirming that it does not *confer* federal

recognition of tribal status where none existed prior to passage of the Act. Venetie contends that the court did not conclude that ANCSA *revoked* tribal status where it did exist prior to the Act. Venetie also claims that any sovereign immunity it may have can be waived only if it is clear from the unambiguous language of ANCSA and its legislative history that Congress intended such a waiver. *See Bryan v. Itasca County*, 426 U.S. 373, 392–93, 96 S.Ct. 2102, 2112–13, 48 L.Ed.2d 710 (1976) (a congressional determination to terminate an Indian reservation must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history); *Atkinson*, 569 P.2d at 167 (sovereign immunity of the Metlakatla Indian Community was waived only if the clear and unambiguous language of the statute and its legislative history show Congress intended such a waiver). Venetie contends that ANCSA is not sufficiently unambiguous to justify my conclusion today.

I recognize that certain federal authority exists for the proposition that ANCSA contains no expression of congressional intent to alter the tribal status of Alaska Indian villages.[16] Nonetheless, I disagree with

(1832) (Marshall, C.J.) (the "several Indian nations [constitute] distinct political communities, *having territorial boundaries*, within which their authority is exclusive....") (emphasis added).

**16.** *See, e.g., Chilkat Indian Village v. Johnson*, No. J84–024 Civ. (D. Alaska, Oct. 9, 1990); *Native Village of Tyonek v. Puckett*, No. A82–369 Civ., transcript of decision (D. Alaska, Dec. 3, 1986), *rev'd on other grounds*, 890 F.2d 1054 (9th Cir.1989). *See also* Eric Smith & Mary Kance wick, *The Tribal Status of Alaska Natives*, 61 U.Colo.L.Rev. 455, 509 (1990) (arguing that ANCSA terminated only aboriginal title and all claims based on that title, and not tribal status). *Cf. Native Village of Noatak v. Hoffman*, 896 F.2d 1157 (9th Cir.1990), *rev'd on other grounds*, *Blatchford v. Native Village of Noatak and Circle Village*, — U.S. —, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (ANCSA constitutes congressional recognition of Native Villages as Indian tribes).

In *Native Village of Tyonek v. Puckett*, 953 F.2d 1179, 1183 (9th Cir.1992), *opinion withdrawn*, 957 F.2d 631 (9th Cir.1992), the Ninth Circuit held on remand from the United States Supreme Court that the Village of Tyonek was entitled to sovereign immunity from a claim that Tyonek Ordinance No. 4 violates the United States Constitution, the Indian Civil Rights Act,

and the Civil Rights Act of 1866. That ordinance provides that "[a]ny white men except government men or outsider coming in is allow [sic] to stay only 24 hours." *Native Village of Tyonek v. Puckett*, No. A82–369 Civ., transcript of decision at 6 n. 2 (D. Alaska, Dec. 3, 1986), *rev'd on other grounds*, 883 F.2d 1024 (9th Cir. 1989), *opinion issued in* 890 F.2d 1054 (9th Cir. 1989). The Ninth Circuit withdrew its opinion approximately two months after it was issued, partly because it was decided that "the present record fails to set forth sufficient facts to demonstrate that the Village is an Indian tribe in the political sense, and that the real property it owns is Indian country." *Tyonek*, 957 F.2d at 634.

In its withdrawn opinion, the Ninth Circuit did not expressly consider the impact of ANCSA in *Tyonek*, for the court had affirmed that portion of the district court's decision holding that ANCSA did not terminate Tyonek's sovereign immunity. The basis for the Ninth Circuit's decision that Tyonek was entitled to sovereign immunity was instead that Tyonek is "Indian country" under the test articulated in *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, — U.S. —, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). That case stated that one test for determining whether land is Indian

this line of federal authority because I see no possible way to reconcile the spirit and the terms of ANCSA with concepts of tribal sovereignty in Alaska. As demonstrated above, many provisions of the Act are at outright odds with any finding of sovereignty. I therefore conclude that ANCSA constitutes an express indication of Congress' will that, with the sole exception of the Metlakatla Indian Community, any sovereign status held by Alaska Native groups prior to 1971 be terminated.[17]

RABINOWITZ, Chief Justice, dissenting.

I dissent.

The superior court held that the section 16 IRA Native Village of Venetie Tribal Government possesses sovereign immunity and that this immunity had not been waived. The superior court further held that the "sue and be sued clause" of Vene-

tie's section 17 corporate charter was sufficient to waive the corporation's sovereign immunity, but stayed further action against Venetie's section 17 corporation requiring Nenana Fuel to first exhaust its tribal court remedies. *National Farmers Union Ins. Co. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). I would affirm the ruling of the superior court.

This court, without determining whether the Native Village of Venetie Tribal Government "actually constitutes a sovereign entity" concludes that the Remedies on Default Clause contained in the note and security agreement effects an express waiver of any sovereign immunity possessed by Venetie, in both its section 16

country is "whether the area has been validly set apart for the use of the Indians as such, under the superintendence of the Government." *Oklahoma Tax Comm'n,* 111 S.Ct. at 910. In applying this test to the land which Tyonek received as a result of ANCSA, the court emphasized that "the mere fact that a tribe holds its land in fee simple does not prevent the land from having the status of Indian country." 953 F.2d at 1183.

I find the Ninth Circuit's reasoning in the withdrawn *Tyonek* opinion unpersuasive for two reasons. First, I believe that the *Tyonek* court erroneously equated Indian country with sovereign immunity. Indian country, defined in 18 U.S.C. § 1151 (1988), is a term used to define the special territory where Indians are governed primarily by tribal and federal law rather than state law. F. Cohen, *Handbook of Federal Indian Law* 28 (R. Strickland ed.1982). While Indian country and sovereignty are often coterminous, they are not necessarily coterminous. *See Stevens Village,* 757 P.2d at 44 (Rabinowitz, C.J. dissenting) (stating that certain Alaska Native villages, which are not Indian country, might be entitled to sovereign immunity). In determining whether the Village of Tyonek was entitled to sovereign immunity, the Ninth Circuit should have examined whether the village's inhabitants constituted a federally recognized tribe.

A second problem with the *Tyonek* decision is that, in determining that Tyonek was entitled to sovereign immunity, it unduly emphasized the fact that Tyonek held land in fee simple. The Supreme Court did the exact opposite in *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), where it expressly held that certain fee-patented reservation land allotted pursuant to the Dawes Act to the Yaki-

ma Tribe and its members is subject to Washington state *ad valorem* taxes. Writing for the majority, Justice Scalia stated that "when § 5 [of the Dawes Act] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." *Id.* at ——, 112 S.Ct. at 691.

17. Nenana Fuel argues that Public Law 280 waived Venetie's claim to jurisdiction over this dispute. Public Law 280 provides in relevant part:

Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian Country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State:

| State of | Indian country affected |
|---|---|
| Alaska | All Indian country within the State |

28 U.S.C. § 1360(a). This argument fails, for we have concluded that Public Law 280 was not intended by Congress to constitute a waiver of sovereign immunity. *Atkinson,* 569 P.2d at 152–53. After an exhaustive review of the statute's history, the *Atkinson* court recognized that the "primary intent of [the Act] was to grant jurisdiction over private civil litigation involving reservation Indians in state court." *Id.* at 166 (citing *Bryan v. Itasca County,* 426 U.S. 373, 385, 96 S.Ct. 2102, 2109, 48 L.Ed.2d 710 (1976)).

(tribal government) and section 17 (business corporation) capacities.

In *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 41 (Alaska 1988) (Rabinowitz, C.J., dissenting), this court held that in the absence of express recognition of tribal status by either Congress or the executive branch of the federal government, an Indian tribe may not avail itself of sovereign immunity. *See also Hydaburg Coop. Ass'n v. Hydaburg Fisheries*, 826 P.2d 751, 754 (Alaska 1992) (Rabinowitz, C.J., dissenting). The court further held that organization under section 16 of the Indian Reorganization Act was not sufficient in itself to afford a village tribal council tribal status for the purpose of tribal sovereign immunity. *Id.* at 40. In reaching this conclusion the court reasoned:

> The more controversial section 2 of the [Indian Reorganization] Act, which empowered the Secretary to create reservations in Alaska, was regarded by the Interior Department as necessary to protect the economic rights of Alaska Natives. Reservations were also thought to be a necessary precondition to native communities' exercising local government powers under section 16 of the IRA.
>
> . . . .
>
> Since Stevens Village was never granted a reservation, the power of local government has never been extended to it. In our view, the mere approval of a section 16 constitution for Stevens Village by the Secretary of the Interior, which itself withholds the power of local government to the Village, does not suffice to afford the Village tribal status for the purpose of application of the doctrine of tribal sovereign immunity.

*Stevens Village*, 757 P.2d at 40. In the instant case, the superior court interpreted *Stevens Village* as indicating that where other factors are present, a section 16 IRA council may be determined to possess sovereignty and as a consequence, sovereign immunity. *Nenana Fuel Co. v. Venetie*, No. 4FA–87–354 CI (Alaska Super., March 13, 1989). Examining Venetie's history of

federal relations, the superior court found the following facts to be relevant to the issue of whether Venetie had been accorded recognition by either Congress or the executive branch of the federal government:

> The Native Village of Venetie was organized under the terms of the Indian Reorganization Act as amended by the Alaska Indian Reorganization Act. The Village's constitution and bylaws were approved by the Secretary of the Interior in 1940 in accordance with § 16 of the Indian Reorganization Act, 25 U.S.C. § 476. Pursuant to Article 4 of the constitution as approved by the Secretary of the Interior, the Village had explicit powers. Included within those powers are the following: (1) "[t]o do all things for the common good which it has done or has had the right to do in the past and which are not against Federal law and such Territorial law as may apply," and (2) "[t]o control the use by members or nonmembers of any reserve set aside by the Federal Government for the Village and to keep order in the reserve." Clearly, these are the powers of a self-governing organization.
>
> At the time of its incorporation under the Indian Reorganization Act, there was no reservation set aside for the inhabitants of the Venetie area. Upon application by the people of the area, on May 20, 1943, the Secretary of the Interior withdrew a 1.4 million acre reservation for the people of the native villages of Venetie, Arctic Village, Christian Village, and Robert's Fish Camp. This reservation was created under § 2 of the Indian Reorganization Act. *See generally Stevens Village*, 757 P.2d at 40. Despite the protestations of the villagers, the Venetie Reservation was abolished in 1971 with the passage of the Alaska Native Claims Settlement Act. ANCSA § 19(a), 43 U.S.C. § 1618(a). Pursuant to the terms of § 19(b), 43 U.S.C. § 1618(b), the village corporations within the former Venetie Reservation elected to acquire title to the surface and subsurface estates of the reserve. When title was acquired, the land was deeded to the

Native Village of Venetie Tribal Government. The court concludes that the termination of the reservation under ANCSA did not abolish the sovereign immunity previously held by the Venetie IRA organization. *See generally DeCouteau [sic] v. District County Court,* 420 U.S. 425, 442–44 [95 S.Ct. 1082, 1091–93, 43 L.Ed.2d 300] (1975); *Menominee Tribe of Indians v. United States,* 391 U.S. 404 [88 S.Ct. 1705, 20 L.Ed.2d 697] (1968); *Kimball v. Callahan,* 590 F.2d 768, 776–77 (9th Cir.), *cert. denied* 444 U.S. 826 [100 S.Ct. 49, 62 L.Ed.2d 33] (1979).

*Id.*

In *Stevens Village,* I agreed with the majority "that IRA incorporation alone does not constitute federal recognition of tribal status for purposes of sovereign immunity." [1] However, I noted in dissent that:

> In the instant case Congress has neither expressly recognized the Village as a tribe for the purposes of sovereign immunity nor expressly waived the Village's immunity.
>
> Therefore, if the Village is in fact a historically sovereign tribe, this court is bound to honor its immunity from suit.
>
> . . . .
>
> Having determined that the federal government has not expressly recognized Stevens Village as a tribe for purposes of sovereign immunity, I would remand the case to afford the Village the opportuni-

ty to make a factual showing as to its alleged tribal status.

*Stevens,* 757 P.2d at 47–48. The facts contained in the record of the instant case are substantially different from those in *Stevens Village* and therefore lead me to conclude that the section 16 IRA Native Village of Venetie Tribal Government has been recognized as a tribe for purposes of sovereign immunity.

Under Article I, sec. 8, cl. 3 of the United States Constitution, Congress is authorized to "regulate Commerce ... with the Indian Tribes." Congress' constitutional authority to legislate with respect to Native Americans is based on the federal government's political relationship with tribes. *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). "Recognition" of a tribe often is effected by Congress in the context of a government-to-government agreement with the tribe, embodied in a treaty or a statute. However, Congress has at times delegated part of its power to recognize particular groups as "tribes" to the Secretary of Interior. *James v. U.S. Dept. of Health and Human Services,* 824 F.2d 1132 (D.C.Cir.1987).[2] Such determinations constitute nonjusticable political questions which are final and binding. *United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913).

> In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political

1. 757 P.2d at 45 n. 6. My reasons for so concluding, however, were based on different considerations than the court's. I stated:

    [T]he Alaska amendment to the IRA allowed any "group[ ] of Indians in Alaska" with a "common bond" to incorporate. 25 U.S.C.A. § 473a (1983). The "common bond" language is extremely broad. In fact, it is nearly identical to that in a previously-enacted statute providing for the organization of federal credit unions having nothing to do with Indians. 12 U.S.C.A. § 1759 (1980). Whether or not so intended by Congress, the expansive "common bond" language has resulted in reorganization under IRA section 16 of Alaska Native groups that clearly had no historical existence as tribal governmental units. For example, the Ketchikan Indian Corporation is organized under both IRA sections 16 and 17. Yet its members "are not descended from any particular Indian community, but are natives

of differing groups who happen to live in Ketchikan." *Board of Equalization v. Alaska Native Bhd. and Sisterhood, Camp. No. 14,* 666 P.2d 1015, 1025 (Alaska 1983) (Rabinowitz, J., concurring). Therefore, it seems unlikely that Congress intended to recognize all IRA section 16 [entities] as tribes for purposes of sovereign immunity.

    *Id.*

2. *See also* 25 C.F.R. 83 (1991). In the absence of Congressional or secretarial recognition, tribal status may in the alternative be judicially proven and, with it, the inherent sovereign authority which flows from that status. *United States v. Washington,* 641 F.2d 1368, 1372–73 (9th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982), *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 585–87 (1st Cir.1979) *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

departments of the government, whose more special duty it is to determine such affairs. If by them these Indians are recognized as a tribe, this court must do the same. If they are a tribe of Indians, then, by the Constitution of the United States, they are placed, for certain purposes, within the control of the laws of Congress.

*U.S. v. Holiday,* 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865); *see also Perrin v. United States,* 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691 (1914); *Atkinson v. Haldane,* 569 P.2d 151, 160 (Alaska 1977). Once Congress or the executive has recognized a tribe, there is no further need for the court to explore the historical basis for the finding of sovereignty. *Stevens Village,* 757 P.2d at 47; *Atkinson,* 569 P.2d at 163.

Given the federal government's grant of an IRA reservation to Venetie for the purpose of encouraging tribal self-government[3], I conclude that Venetie was federally recognized as a tribe for the purpose of sovereign immunity. Further support for this conclusion is found in the fact that Venetie's constitution, as approved by the Secretary of Interior, gives it general police power to "control the use by members or nonmembers of any reserve set aside by the Federal Government for the Village and to keep order in the reserve."

It is well established that federally recognized tribes enjoy sovereign immunity from suit absent congressional abrogation or waiver. *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In *Stevens Village* the court reasoned that because ANCSA "evidences Congress' intent that non-reservation villages be largely subject

to state law," it cannot be deemed to have recognized the villages as tribes. 757 P.2d at 41. In dissent, I stated,

[I]n ANCSA, ... Congress did not address immunity. The court does not cite a single provision of ANCSA that directly or indirectly suggests a waiver of sovereign immunity. Rather the court infers this intent, an approach which is at odds with the rule that a waiver of immunity must be clearly expressed.

One of the provisions the court uses to bolster its waiver conclusion is the section that permits taxation of certain lands granted pursuant to ANCSA. 43 U.S.C.A. § 1620(d) (1986). In my view this section supports the opposite conclusion, because it is an excellent example of the type of clear expression Congress must make to waive an immunity, in this case tax immunity.

The court concludes that ANCSA "evidences Congress's intent that non-reservation villages be largely subject to state law." Even assuming that this is true, it does not deprive the villages of sovereign immunity.... Congress does not necessarily waive the sovereign immunity of Indian tribes when it subjects them to some measure of state law.

In short, nothing in ANCSA, the IRA, or any of the earlier enactments approaches the type of express congressional statement that is necessary to waive sovereign immunity.

*Stevens Village,* 757 P.2d at 45 (citations omitted).

Contrary to the notion that ANCSA represents Congress' express intent to extinguish those self-governing powers possessed by Alaska's Native villages, in my view the legislative history of the Act indicates otherwise. As one of ANCSA's

---

**3.** One of the specific purposes for creating the IRA reservations was to establish boundaries within which the IRA councils would exercise their governmental powers. *See* Secretary of the Interior Harold L. Ickes' *Instructions for Organization in Alaska Under the Reorganization Act of June 18, 1934 and the Alaska Act of May 1, 1936,* Dec. 22, 1937. Shortly before the IRA reservations were revoked, the Alaska Regional Solicitor thoroughly analyzed the status of the IRA reservations. The solicitor conclud-

ed that the tribes possess a substantial quantum of ownership control over reserve lands and "possess relatively broad powers for the local management of their affairs, under the department's usual trust supervision common to all reservations generally." Memorandum from Regional Solicitor, Anchorage, to Anchorage Superintendent, BIA, "Native Village of Karluk and the [R]eservation at Karluk," January 22, 1968; *quoted in* D. CASE, ALASKA NATIVES AND AMERICAN LAWS at 107 (1984).

prime architects, Senator Ted Stevens stated:

> [W]e have a basic agreement on the fact that Alaska Native people themselves should have the right to self-determination. This is consistent with the President's policy of self-determination without termination.[4]

Far from representing an express extinguishment of sovereignty, ANCSA is properly viewed as an expression of Congress' recognition of Alaska Natives' aboriginal title.[5]

> The consistent policy of the United States in its dealings with Indian Tribes has been to grant them title to a portion of the lands which they occupied, to extinguish the aboriginal title to the remainder of the land by placing such land

in the public domain, and pay the fair value of the title extinguished.[6]

Congress followed this policy in its treatment of Alaska Native villages when it enacted ANCSA. ANCSA replaced unprotected aboriginal lands with a full fee title interest and vested that fee title and monetary compensation in specific Native corporations to facilitate economic development.[7]

To protect the Native people in their transition to economic self-sufficiency, Congress elected to place several provisions in ANCSA that restricted alienation of the land for the first twenty years, exempted from taxation undeveloped lands for twenty years, and exempted the corporations from various SEC restrictions. The 1980 Alaska National Interest Lands Conservation Act (ANILCA)[8] and the ANCSA

---

**4.** 117 CONG.REC. 38440 (daily ed. Nov. 1, 1971). *See also* 116 CONG.REC. 24216, 24220–27, 24234–35, 24378–82 (daily ed. July 14, 1970) (remarks of Senator Fred Harris strongly opposing any proposals to terminate Native American programs for Alaska Natives). More recently, Senator Stevens reiterated that:

> ANCSA was and is a land settlement. It did not terminate the special relationship between Alaska Natives and the Federal Government or resolve any questions concerning the governmental status, if any, of various Native groups. There's not one reference to sovereignty in ANCSA or in the 1971 Conference report. The Act's declaration of settlement is very clear. It extinguishes aboriginal claims of settlement and aboriginal hunting and fishing rights, and nothing more or less.

*Hearings on S. 2065 before the Subcommittee on Public Lands of the Senate Committee on Energy and Natural Resources*, 99th Cong., 2d Sess. 329 (1986) (statement of Senator Stevens).

**5.** The United States Supreme Court has recognized that the right to aboriginal title is a tribal one. *Oneida Indian Nation v. Oneida County*, 414 U.S. 661, 667, 669, 94 S.Ct. 772, 777, 778, 39 L.Ed.2d 73 (1974).

**6.** H.R.REP. No. 523, 92d Cong., 1st Sess. 4 (1971); *quoted in* Smith & Kancewick, *The Tribal Status of Alaska Natives*, 61 U.Colo.L.Rev. 455, 510 (1990).

**7.** It is interesting to note that Congress employed a corporate mechanism almost forty years earlier to encourage Native American tribal economic development in section 17 of the Indian Reorganization Act.

**8.** Act of Dec. 2, 1980, P.L. 96–487, 94 Stat. 2371. As Venetie aptly points out to the court:

[With ANILCA,] Congress extended the tax exemptions for Native Corporation land, created a tax exemption for land which individual Natives received from their corporations as shareholder homesites, and allowed Native Corporations to amend their bylaws in two important ways: to give themselves a "right of first refusal" over sales of Native Corporation shares, and to limit voting rights to Natives or descendants of Natives. The rights of first refusal and Native-only voting limitations were "designed to limit the possibility of take over of Native Corporations by outside interests." S.REP. NO. 96–413, 96th Cong., 1st Sess. 310 (1979), *reprinted in* 1980 U.S. CODE CONG. & ADM.NEWS 5070, 5254.

Further, ANILCA established a "land bank" into which Village Corporations could put their land, thereby obtaining immunity from adverse possession, real property taxes on undeveloped property, and judgment execution. The Village Corporation had to agree not to alienate or pledge the lands (except for the required conveyances under ANCSA § 14(c), 43 U.S.C. § 1613(c)). The statute explicitly provided that "For purposes of this section only, each agreement entered into with [an Alaska Native Corporation] shall constitute a *restriction against alienation* imposed by the United States upon the lands subject to the agreement." 43 U.S.C. § 1636(b)(1) (emphasis added).

ANILCA provided Land Bank protection for *all* undeveloped Native Corporation land for at least three years. 43 U.S.C. § 1636(d). Yet Congress eventually concluded that this, too, was not sufficient. In § 11 of the Alaska Native Claims Settlement Act Amendments of 1987, Pub.L. 100–241, 101 Stat. 1788, Land Bank protections are made automatic and permanent and extended to corporate bank-

amendments transformed these provisions into permanent protections.[9]

I also reject the notion that ANCSA's termination of Venetie's reservation constitutes a manifestation of Congress' "clear purpose to terminate" Venetie's powers of self-government.[10] It is well established that tribal status and governmental powers survive the termination of a reservation unless clearly and unequivocally extinguished by Congress. In the case at bar, clear and unequivocal extinguishment by Congress has not occurred. *United States v. Santa Fe Pacific R.R.*, 314 U.S. 339, 353, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941); *Decoteau v. District County Court*, 420 U.S. 425, 442–44, 95 S.Ct. 1082, 1091–93, 43 L.Ed.2d 300 (1975); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Kimball v. Callahan*, 590 F.2d 768, 776–77 (9th Cir.), *cert. denied* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979). Federal courts have ruled that this principle applies equally to ANCSA villages. *See Chilkat Indian Village v. Johnson*, No. J84–024 Civ. (D. Alaska, Oct. 9, 1990) (if Chilkat had governmental power under its status as a reservation ANCSA did nothing to extinguish those powers); *Native Village of Tyonek v. Puckett*, 890 F.2d 1054 (9th Cir.1989) (ANCSA did not abrogate Tyonek's tribal sovereign immunity); *cf. Native Village of Noatak v. Hoffman*, 896 F.2d 1157 (9th Cir.1990) *rev'd on other grounds, Blatchford v. Native Village of Noatak and Circle Village*, —— U.S. ——, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (ANCSA constitutes Congressional recognition of Native Villages as Indian tribes).[11]

ruptcy proceedings. *See* 43 U.S.C. § 1636(d)(1). They are to remain in effect so long as the corporation involved remained under Native control. *See* 43 U.S.C. § 1636(d)(4). Expansion of the Land Bank program is meant to promote the "sound" "underlying concept of protecting Native land ownership." S.REP. NO. 100–201, 100th Cong., 1st Sess. 36 (1986), *reprinted in* 1988 U.S. CODE CONG. & ADM.NEWS 3269, 3286.

9. Pub.L. 100–241, 101 Stat. 1788. Indian legislation is entitled to favorable rules of judicial construction and any ambiguities must be construed in favor of Indian rights. *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Alaska Pacific Fisheries Co. v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918); *In re City of Nome, Alaska*, 780 P.2d 363, 367 (Alaska 1989). As the United States Supreme Court explained, favorable rules of judicial construction apply to Indian legislation because,

Indians stand in a special relation to the federal government from which the states are excluded unless the Congress has manifested a clear purpose to terminate immunity and allow states to treat Indians as part of the general community.

*Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, 613–14, 63 S.Ct. 1284, 1291–92, 87 L.Ed. 1612 (1943); *quoted in Bryan*, 426 U.S. at 392, 96 S.Ct. at 2112. This court has recognized that this principle applies equally to ANCSA. *See Hakala v. Atxam Corp.*, 753 P.2d 1144, 1147 (Alaska 1988) (ambiguities in ANCSA, as in other federal statutes for the benefit of Indians, are to be construed in favor of the Indians).

10. The residents of the reservation opted to keep their reservation lands intact rather than become shareholders in the Doyon regional corporation or receive any distributions of money from the Alaska Native Fund. *See* February 20, 1973 letter from the Solicitor's office to Gideon James in Arctic Village. The state-chartered ANCSA corporations formed for Venetie and Arctic Village were eventually deeded the former reservation lands in fee simple which were then conveyed to the Native Village of Venetie Tribal Government, which now holds the land in fee simple.

11. The federal government has maintained its special relationship with Alaska Natives to facilitate the goals of self-determination. This circumstance is evidenced by the fact that ANCSA villages have been recognized in virtually all modern Indian legislation enacted since 1971. *See e.g.* Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. § 450a(b), 450b(e) (policy of U.S. "is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments"); Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 ("[r]ecognizing the special relationship between the United States and the Indian tribes and their members ... (2) ... Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed responsibility for the protection and preservation of Indian tribes and their resources"); Indian Financing Act of 1974, 25 U.S.C. § 1451, 1452(c), 31 U.S.C. § 7102 (tribes, including Alaska Native Villages, defined as "states" and thus as governments entitled to benefits of the Act); and Indian Tribal Tax Status Act of 1986, 26 U.S.C. § 7701(40), 7871 (Indian tribal governments treated as States for certain purposes).

Furthermore, I disagree with this court's position that the Remedies on Default Clause contained in the note and security agreement effects an express waiver of any sovereign immunity possessed by the section 16 IRA Native Village of Venetie Tribe. *Atkinson v. Haldane*, 569 P.2d 151, 174 (Alaska 1977), contains a lengthy discussion of our view that a governmental unit created pursuant to section 16 of the Indian Reorganization Act [12], and the corporate unit created pursuant to section 17 of that Act, are distinct legal entities. *Atkinson* notes that Opinions by the Solicitor, Department of the Interior, the legislative history of the Act, and considerations of sound public policy support the notion of two legal entities, "one with sovereign immunity, the other with the possibility for waiver of that immunity." *Id.*[13]

While there is considerable difference of opinion between courts regarding whether a "sue and be sued" clause of a section 17 corporation's charter constitutes a general waiver of immunity possessed by a tribal corporation,[14] the United States Supreme Court has mandated that the immunity possessed by a tribal governing body remains intact unless surrendered in express and unequivocal terms. *Santa Clara Pueblo v.*

*Martinez*, 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Moreover, because an implied waiver exception would undermine the federal concern for tribal political and economic development,[15] a waiver of tribal immunity cannot be implied but must be unequivocally expressed. *Id.; Pan American Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416 (9th Cir. 1989); *American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1377–78 (8th Cir. 1985); *Wichita and Affiliated Tribes v. Hodel*, 788 F.2d 765, 773 (D.C.Cir.1986).

Given these well established principles, I conclude that neither the "sue and be sued" clause nor the Remedies on Default Clause constitute an explicit and unequivocal waiver of immunity by Venetie's section 16 tribal governing body. *Atkinson v. Haldane*, 569 P.2d 151, 175 (Alaska 1977). As to the section 17 Venetie corporate body, I am persuaded that principles of comity require that the extent and effect of any such waiver be determined in the first instance by the tribal court. *See A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1418 (9th Cir.), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 2008, 90 L.Ed.2d 659 (1986); *R.J. Williams Co. v.*

---

**12.** 25 U.S.C. § 476, 477.

**13.** *See also* F. Cohen, Handbook of Federal Indian Law 325–26 (1982 ed.).

> In passing the IRA Congress intended to allow the tribes a certain amount of freedom to enter and compete in the private business world. Early drafts of the Act proposed a single tribal entity continuing the tribes' preexisting power to govern its members politically and adding new corporate powers to allow the tribe to engage in business dealings. An objection was raised that tribal immunity would prevent such an entity from obtaining credit. To resolve this problem, Congress authorized the tribes to organize two separate entities: a political governing body to exercise preexisting powers of self-government pursuant to section 16 of the Act, and a new tribal corporation to engage in business transactions pursuant to section 17....
>
> Those tribes electing to form section 17 business corporations received a charter drafted by the Bureau of Indian Affairs. These charters often contain a clause allowing the corporation to sue and be sued. Some courts have held this language to be a waiver of the immunity of the tribal corporation.

> But this waiver is limited to actions involving the business activities of the section 17 corporation. Complications in determining the waiver can arise from the fact that many tribes have not clearly separated the activities of their section 16 tribal governments from the section 17 business corporations. This should not broaden the consent provision, because congressional authority for the consent to suit is clearly predicated on the existence of two different organizations and is limited to business transactions. Any action against the tribe acting in a governmental capacity is beyond the scope of the waiver and should be barred.

(Citations omitted.)

**14.** For example, *compare Boe v. Fort Belknap Indian Comm.*, 642 F.2d 276 (9th Cir.1981), *aff'g* 455 F.Supp. 462 (D.Mont.1978); *Parker Drilling Co. v. Metlakatla Indian Comm.*, 451 F.Supp. 1127 (D. Alaska 1978); *Martinez v. Southern Ute Tribe*, 150 Colo. 504, 374 P.2d 691 (1962).

**15.** *See* Indian Reorganization Act, 25 U.S.C. § 461–479 (1976); Indian Self–Determination and Education Assistance Act § 3, 25 U.S.C. § 450a (1976).

*Fort Belknap Housing Auth.*, 719 F.2d 979 (9th Cir.1983); *Weeks Const. Inc. v. Oglala Sioux Housing Auth.*, 797 F.2d 668, 674 (8th Cir.1986). *Burlington N. R.R. v. Crow Tribal Council*, 940 F.2d 1239 (9th Cir.1991).

The importance of deferring to tribal forums was emphasized by the United States Supreme Court in *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Ins. Co. v. La-Plante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).[16] In *National Farmers Union,* the Supreme Court explained:

We believe that examination should be conducted in the first instance in the Tribal Court itself. Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge. Moreover, the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.... Exhaustion of tribal remedies, moreover, will encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such

matters in the event of further judicial review.

471 U.S. at 856–57, 105 S.Ct. at 2453–54 (citations omitted). In *Iowa Mutual Ins. Co.,* the exhaustion requirement was extended as a matter of comity to cases involving the diversity jurisdiction of the federal courts. 480 U.S. 9, 107 S.Ct. 971. The Court rejected an attack on tribal court jurisdiction on the basis of local bias and incompetence by stating, "[w]e have rejected similar attacks on tribal court jurisdiction in the past. The alleged incompetence of tribal courts is not among the exceptions to the exhaustion requirement established in *National Farmers Union,* and would be contrary to the congressional policy promoting the development of tribal courts." *Id.* at 19, 107 S.Ct. at 978 (citations omitted).

Relying on these two seminal cases, the superior court in the instant case correctly concluded:

The comity principles of *National Farmers Union* and *LaPlante* are well-reasoned and should be adopted by the state courts. The federal government, with its special constitutional relationship to the Indian tribes, has long had the primary role in shaping the policies which relate to the states' relationships with the tribes. The special federal role in determining policies was recognized by ·the Alaska Supreme Court in *Atkinson v. Haldane,* 569 P.2d 151, 163 (Alaska 1977) (the supremacy of federal law required the recognition of the tribe's sov-

---

**16.** A tribe need not first show that it "has a functioning tribal court," nor establish what its jurisdiction is, before exhaustion principles apply. In *Iowa Mutual,* the United States Supreme Court quoted a lower court's holding which found:

[w]e merely permit the tribal court to initially determine its own jurisdiction. The tribal court's determination can be reviewed later 'with the benefit of [tribal court] expertise in such matters.'

480 U.S. at 14, 107 S.Ct. at 975 (citations omitted). In support for this position the Supreme Court stated:

[In *National Farmers Union* ] we refused to foreclose tribal court jurisdiction over a civil dispute involving a non-Indian.... We concluded that, although the existence of tribal court jurisdiction presented a federal question

... considerations of comity direct that tribal remedies be exhausted before the question is addressed by the District Court.... Promotion of tribal self-government and self-determination required that the Tribal Court have "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction.

*Id.* at 15–16, 107 S.Ct. at 975–76 (citations omitted). The Court further reasoned:

Tribal authority over the activities on non-Indians on reservation lands is an important part of tribal sovereignty.... Civil jurisdiction over such activities **presumptively** lies in the tribal courts unless affirmatively limited....

*Id.* at 18, 107 S.Ct. at 977 (emphasis added) (citations omitted).

ereign immunity even in the face of valid public policy reasons to disregard it). The federal policies enunciated in *National Farmers Union* are equally applicable to a question of the state court's exercise of comity. The exercise of jurisdiction by the state court is no less likely to impact negatively the federal policy favoring the development of tribal courts than is the exercise of jurisdiction by the federal court.

*Nenana Fuel Co., Inc. v. Native Village of Venetie*, No. 4FA–87–354 CI (Alaska Super., November 21, 1989).